The PRESIDENT, DIRECTORS, and COMPANY of the NEW-
BURGH and COCHECTON TURNPIKE ROAD,

*against*

MILLER and others.

Where one has a grant of a ferry, bridge, or road, with the exclusive
right of taking toll, the erection of another ferry, bridge, or road, so
near it as to create a competition injurious to such franchise, is, in
respect to such franchise, a nuisance: and this Court will grant a
perpetual injunction to secure the enjoyment of the statute franchise,
and prevent the use of the rival establishment.

The word " may," in a statute, means *must* or *shall*, in those cases only
where the public are interested, and the public or third persons have
a claim, *de jure*, to have the power exercised.


THE bill, which was filed *September* 2d, 1818, stated,    *January 26.*
that by an act of the legislature, passed the 20th of *March*,
1801, entitled, " An act to establish a turnpike corporation,
for improving and making a road from the village of *New-
burgh*, on the *Hudson* river, to *Cochecton*, on the *Delaware*
river ;" the plaintiffs were incorporated, and were authorized
to enter on any land where they should deem it proper to
construct a road, and to lay out and survey such tracts or
routes as should be deemed most practicable for making a
good and sufficient road ; and that as soon as they should
have completed the bridge over the *Wallkill*, where the said
road should pass the same, it should be lawful for the plain-
tiffs to erect a gate and turnpike upon and across said bridge,
and to demand and receive, &c. one half of the toll as grant-
ed in the said act, for every ten miles, &c. ; provided the in-
habitants who reside within five miles of the bridge on either
side, shall be allowed to compound with the plaintiffs, by the
year, for passing and using the said bridge.    That the plain-
tiffs entered upon the lands required, and surveyed and laid
out the route of the road, and had it viewed and inspected ;

1821.

NEWBURGH
TURNPIKE Co.
v.
MILLER.

erected toll-gates thereon, according to the said act, and the act amending the same, passed *February* 28, 1806. That the plaintiffs, in 1808 and 1809, erected and completed a *good and sufficient bridge across the Wallkill, and erected a gate and turnpike* upon and across the same, and collected toll, &c. That the said bridge was built, and is maintained at great expense and hazard ; that the *Wallkill*, at the bridge, is a deep and broad stream ; a map of which bridge, &c. was annexed to the bill. The bill further stated, that *Francis Fowler* and *Johannis Miller*, in conjunction with others, with intent to injure the plaintiffs, and deprive them of the enjoyment of the bridge, and the emoluments thereof, and to avoid the gate thereon, did, in 1818, erect another bridge over the said river, distant only eighty rods, by the road, from the bridge of the plaintiffs. That *F. F.* procured from the trustees of the Reformed *German* church in *Montgomery* town, in the county of *Orange*, (defendants) an instrument under their corporate and private seals, conveying to him, *F. F.*, a strip of land, three rods wide, from the bridge erected by *F. F.*, to the turnpike road of the plaintiffs. That the said church and the defendants, trustees of the church, with intent to injure the plaintiffs, in the enjoyment of their bridge, did, on the 2d of *February*, 1818, by their corporate and individual seals, grant to *F. F.* in fee, such strip of land, being part of the real estate of the said church, to be used as a public highway, and for no other purpose. That the said grant is void, being made to *F. F.* absolutely ; the lands not appearing to be leased or improved for the use of the church, or conveyed for any pious use. That the conveyance purports to have been made for the consideration of thirty dollars ; but no consideration was ever paid or required. That the defendants, in order to injure the plaintiffs, procured the said strip of land and bridge to be laid out by the commissioners of highways, as a *public highway ;* and the order of the commissioners was recorded on the 23d of *May*, 1818. That the act of the

commissioners of highways being appealed from, three of the
judges of the Court of Common Pleas of the county of
*Orange*, on the 5th of *August*, 1818, declared the act of the
commissioners useless, and annulled the same; and their or-
der of reversal was recorded the 6th of *August*, 1818, of
which appeal and reversal the defendants had due notice.
That on the 6th of *August*, 1818, the plaintiffs closed up
the said road by a fence within the bounds of their turn-
pike. That on the 22d of *August*, 1818, the defendants
removed the fence, by which means the travelling has been
diverted to that road, to the loss of the plaintiffs, of 500
dollars. That the said by-road and bridge are unnecessary
and useless, as the turnpike furnishes a better way, and the
by-road is only about two chains nearer than the other,
from the point where it leaves the turnpike to the point
where it strikes it again. That the compact part of the
village of *Montgomery*, is designated on the map annexed
to the bill, and the land lying between that part and the
new bridge, lies partly in common and partly improved,
but has no cross streets or roads, nor are there any houses
or inhabitants to be accommodated by the new bridge.
That the defendants, since the order of the Judges of the
Court of C. P. annulling the by-road as a public highway,
have refused to shut up and discontinue such by-road and
bridge, and have procured money to be raised by a vote of
the town of *M.* for keeping open the road and defraying
the expenses of the defendants, in resisting the rights of the
plaintiffs. The plaintiffs *prayed* that the conveyance to *F.
F.*, or any other relative, to the road and bridge, may be
produced, and that the defendants may be restrained by
injunction from supporting the by-road and bridge, or
diverting the travelling from the bridge of the plaintiffs,
and that the said by-road and bridge may be shut up and
discontinued; and for general relief, &c.

The defendants, in their answer, stated, that *Montgomery*

1821.

NEWBURGH
TURNPIKE Co.
v.
MILLER.

1821.

NEWBURGH
TURNPIKE Co.
v.
MILLER.

was a flourishing village, containing 600 souls, and was in-
corporated the 17th of *February*, 1810. That the inhabi-
tants wished the plaintiffs to continue their road on to where
*Fowler's* bridge is, and that it should cost them no addition-
al expense; that it would have been 14 chains shorter than
the other road. That for fifty years, a free bridge had been
erected and kept up by the town of *M.*, across the *Wallkill*,
near where the *New-York* and *Albany* state road now cross-
es the river. That in 1809, the plaintiffs, with a view to in-
tercept the travel on the state road, erected their bridge close
to the old bridge. That in 1814, *Benjamin Sears* applied
to the trustees of the *German* church, for a right of way
over their ground, from the place where *Fowler's* bridge is,
to the turnpike, with intention to erect the bridge. That
the church and the congregation agreed to make the grant
of such right of way, as much more convenient for the
church and the public; but *S.* died before the grant was
made, or the bridge built. That *J. Fowler* renewed the ap-
plication, and the grant was made to him on the 2d of *Fe-
bruary*, 1818, for the consideration of thirty dollars. That
*Fowler* afterwards erected the bridge. The trustees denied
that the grant was made with a view to injure the plaintiffs,
or to divert the travelling from their road and bridge, or to
evade the toll; but that the grant was made to benefit the
land of the church, and for the accommodation of persons
attending public worship in their church. That on the 16th
of *May*, 1818, the road was duly declared a public high-
way, by the commissioners and recorded; but the order be-
ing appealed from, was annulled, as charged in the bill.
That the road was beneficial to the village, and to the church
land; and if shut up, the value of the lots in *Harmony-
street* would be diminished one half. They admitted, that
the plaintiffs put up the fence, on the 6th of *August*, 1818,
but they denied that they removed it, or aided in its remo-
val. They admitted, that when *Fowler's* bridge was open-

ed, there was some travelling over it, by which the plaintiffs lost some toll; but they averred that *F.*, and the persons interested in the adjacent lands, had a right to keep open the road, as a private way, and that it is necessary to the convenience and extension of the village. That it is a shorter way by at least 10 chains and an half, and much better for travelling. They admitted, that the inhabitants of *M.*, at a regular town meeting, by a large majority, voted 200 dollars to be employed in defending their common rights, and that a committee of the inhabitants attended before the judges on the appeal, and offered evidence of the greater benefit of the road by *Fowler's* bridge to the village. That the inhabitants would have removed the proceedings in that suit, into the Supreme Court, had they not been prevented by the injunction issued by this Court. That on the 17th of *March*, 1815, an act was passed, on the application of the plaintiffs, authorizing them to remove the toll gate from their bridge, and to receive from the first toll-gate west of the bridge, the same rate of toll as for twelve and a half miles; and the additional toll for passing their bridge is laid on the next gate, which is all the compensation they ought to receive; and they ought, pursuant to the act, to remove their gate from the bridge. That the defendants supposed that it was the intention of the plaintiffs to remove the gate from the bridge, and they, therefore, contributed money to build *Fowler's* bridge, and make the new road; but the plaintiffs are suffering the bridge to go to decay, and it will soon fall, unless repaired. That the *Wallkill*, at the bridge, is a sluggish stream, about three feet deep, with a gravelly bottom, and never rises above six feet. The defendants prayed that the injunction might be dissolved.

Many witnesses were examined upon both sides; but it is not necessary to detail their evidence.

*Betts*, for the plaintiffs.

*Slosson*, for the defendants.

1821.

NEWBURGH TURNPIKE Co.
v.
MILLER.

1821.

NEWBURGH
TURNPIKE Co.
v.
MILLER.

THE CHANCELLOR. This is a suit to enjoin the defend-
ants from disturbing the plaintiffs in the enjoyment of their
toll-gate on the bridge over the *Wallkill*, at the village of
*Montgomery*, and to shut up the private road and bridge de-
signated on one of the maps in the cause, by the letters *R.
O. J. L. M. N. K.*

The following are the most material facts in the case:
The plaintiffs were incorporated by an act of the legislature,
passed the 20th of *March*, 1801, (sess. 24. ch. 36.) for the
purpose of making " a good and sufficient road, to run in
the nearest, most convenient, and direct route, as far as cir-
cumstances would admit, from the village of *Newburgh*, on
*Hudson's* river, to *Cochecton*, on the *Delaware* river." The
corporation so created was authorized to " enter into and
upon any land where they should deem it proper to construct
the said road, and to lay out and survey such tracts or routes
as should be deemed most practicable, for making a good
and sufficient road between the places aforesaid." But they
were not authorized " to make the said road through any
garden, without the consent of the owner, if such garden
shall have been cultivated as such, at least ten years before
such road shall be laid out." And as soon as the plaintiffs
should have " completed the bridge over the *Wallkill*, where
the said road should pass the same, it should be lawful for
the corporation to erect a gate and turnpike upon and across
said bridge, and to ask, demand, and receive, of and from
all and every person and persons who should pass over and
use the said bridge, one half of the tolls and duties," &c.
Provided, those inhabitants who resided within five miles of
the said bridge, on either side, should be allowed to com-
pound with the president and directors, by the year, for pass-
ing and using said bridge." And there was a further *pro-
viso*, " that nothing in the act should be construed to entitle
the corporation to demand toll of or from any person pass-
ing to or from public worship, on Sunday," &c. And it
was further provided, " that if any person or persons should,

with his or their team or teams, carriage, or horse, turn out of said road, to pass any or either of the gates, on ground adjacent thereto, and again enter on said road, having passed the said gate or gates to avoid the payment of the toll due by the act, such person or persons should forfeit and pay a fine not exceeding 5 dollars," &c.

In pursuance of the provisions of this act, a turnpike road was duly laid out, inspected, and passed, and gates erected in 1804; and in passing through the village of *Montgomery* the road crossed the *Wallkill*, or, at least, on one side touched the *Wallkill* at, or very near the spot where the old bridge stood, and where the road had crossed it for nearly half a century before. The turnpike road so laid out and crossing the *Wallkill*, is designated on the map above referred to by the letters *D. A. B. E. F.* The road so laid out, appears to have been judiciously located, under the existing circumstances of the case, in 1804, and probably to the satisfaction and the best accommodation of the public at that time. There were difficulties and obstructions not easily to have been surmounted, in carrying the road directly on from the place on the map designated by *R.* or *D.*, westerly, to the *Wallkill;* and the shortening the distance a few rods was of no consequence to the public.

A supplementary act was passed in favour of the plaintiffs, on the 28th of *February*, 1806, (sess. 29. ch. 29.) and before any new bridge had been erected by the plaintiffs over the *Wallkill*. By this act, the plaintiffs were authorized, when a good and sufficient bridge across the *Neversink* river should have been completed, to place upon and across such bridge a gate and turnpike, and to ask and demand one half of the toll and duties allowed to be demanded " for passing a gate to be erected on the bridge to be built over the *Wallkill*." The plaintiffs, in consideration of the toll to be taken on the *Neversink* bridge, were entitled to demand of any person " passing the gate to be erected on the bridge over the *Wallkill* river, when the same is built, only one half

the toll and duties allowed to be demanded by the former act."

It is to be observed, that this act was passed about two years after the road had been laid out nearly as it now leads over the *Wallkill*, and we are to presume that location was well known to the legislature, it being a matter of public notoriety ; and this act was an implied recognition of that road, for the purpose of the bridge.

The bridge was made and finished, and a toll-gate established upon it, in 1809, and from that time to the commencement of this suit, the plaintiffs have been in the exercise of the right to the bridge, and the toll-gate erected on it.

In 1810, the inhabitants of the village of *M.* were incorporated for local purposes ; and in 1812, the trustees of the village laid out, into streets and squares, the ground N. W. of the inhabited part of the village, and between it and the *Wallkill*.

On the 17th of *March*, 1815, ( sess. 38. ch. 79.) another act was passed in relation to the plaintiffs, in which it was made " lawful for the president, directors, and company to remove the toll-gate from off the bridge at the village of *Montgomery*, and to ask, demand, and receive, at, and from all persons passing the first gate west thereof, the same rate of toll, as for twelve and an half miles of the said road." A similar provision was made in respect to the gate on the *Neversink* bridge.

The plaintiffs have not as yet availed themselves of this power to remove their toll-gate on the *Wallkill* bridge, and to increase their rate of toll at another gate, but in respect to that bridge, they have continued to exercise the rights and privileges conferred by the former statutes.

About the time of the passage of this last act, *Benjamin Sears* was the principal owner of the grounds so laid out by the trustees, to the N. West of the village, and he had it in contemplation to open a road and erect a free bridge over the *Wallkill*, at the place where the road and bridge,

designated in the case as *Fowler's* bridge, have been since made. There can be no doubt that the object of Mr. *Sears* was to increase the value, and to make better sales of the lots and grounds so lying to the N. W. of the village. After his death, his intentions which had been partly executed by him, were carried into full effect by *Francis Fowler*, with the countenance and assistance of the defendants and others; and about three or four years ago, the bridge complained of was built. *Fowler* obtained a grant from the defendants, who are trustees of the *German* church, on the 2d of *February*, 1818, for a strip of land three rods wide, from the bridge built by him, westerly, to the turpike road of the plaintiffs, and the grant was made expressly for the purpose of a public road. The words of the grant were, " to use and occupy the same as a public highway, and not otherwise." In *May*, 1818, the new road so laid out was declared by the commissioners of the highways, of the town of *Montgomery*, upon due application by twelve freeholders, to be a public highway. But on appeal to three judges of the Court of Common Pleas, according to the provisions of the highway act, the premises were inspected, and the allegations and proofs of the parties in interest heard, and the road declared to be unnecessary and inexpedient, and the order of the commissioners was annulled.

Upon these facts, connected with a number of circumstances in proof, (but which do not materially affect the question of right or of remedy,) the subject for consideration and decision is, whether the plaintiffs are not unlawfully disturbed in the enjoyment of their toll-bridge, and whether it be not a case calling for the interposition of this Court?

I shall lay out of view, as altogether inapplicable to the question of right, how far the new road and bridge have an influence upon the value of property within their vicinity, and how far the extension of the village in that direction may be accelerated or retarded by the continuance or removal of the new bridge. If the road of the plaintiffs was

laid out across the *Wallkill*, at the place where their bridge now stands, within the intent and meaning of the acts by which they were authorized to establish a road and toll-bridge, then the plaintiffs are in the enjoyment of a franchise or statute privilege, of which they cannot be devested by such considerations. Nor can the state or condition of either bridge, be a matter of any moment in the decision of this case, unless, indeed, the bridge of the plaintiffs was so far out of repair as not to afford a passage with ordinary convenience and safety. The evidence, however, does not warrant any such conclusion, and the statute of the 10th of *April*, 1813, (sess. 36. ch. 91.) affords a prompt and effectual remedy, if the case existed. It is enacted by the statute last referred to, that the commissioners for inspecting turnpike roads, whenever complaint is made to them that any turnpike road is out of repair, (and the bridge in question is to be taken as part of that road,) shall examine the road, and if they discover the road not to be in good repair, " or shall find any of the gates placed in situations contrary to law," they shall give notice to the Company of such defect or default, and if they do not immediately repair the defect, remove the gate, or throw open the gate, as the case may require, they are subjected to prosecution and penalty. It must be admitted, upon the view of this case, that the plaintiffs are in possession of a franchise granted by statute, and that the title to it has not been duly questioned ; and the only inquiry is, whether the new road and bridge be not a disturbance of it, by hindering or disquieting the plaintiffs in the regular and lawful enjoyment of their toll.

The bridge of the plaintiffs is part of their road, and the gate upon that bridge is entitled to equal protection with any gate upon their road. Considering the proximity of the new bridge, and the facility that every traveller has, by means of that bridge and the road connected with it, to

shun the plaintiff's gate, which he would otherwise be obliged to pass, I cannot doubt, for a moment, that the new bridge is a direct and immediate disturbance of the plaintiffs in the enjoyment of their privilege. The *quo animo* is not an essential inquiry in the case. Whatever may have been the intention of the defendants, the new road and bridge do directly and materially impair the use and value of the plaintiffs' franchise. It is a case, therefore, proper for the special interference of this Court, to relieve the plaintiffs from a great evil, or the necessity of incessant litigation with travellers. They bring themselves within the case of the *Croton Turnpike Company* v. *Ryder*, (1 *Johns. Ch. Rep.* 611.) and are entitled, within the doctrine of that case, to be quieted in the enjoyment of their right.

There is some little difference between the parties, as to distances, in respect to the two roads, but the difference is so inconsiderable, as to become perfectly immaterial. Whether the road be not shortened at all, or from two to fourteen chains, in a distance of about three-fourths of a mile, cannot alter the rights of the parties. The distance may be lessened a few rods by the new road, but the proximity of the new road, and the proximity of the two bridges, is so close and striking, as to render the same a most palpable and immediate annoyance and interruption to the enjoyment of the plaintiffs' toll-bridge. The new road, by its *termini*, and its vicinity, creates a competition most injurious to the statute franchise, and becomes, what is deemed in law, in respect to such a franchise, a nuisance. It was observed, in the case of *Ogden* v *Gibbons*, (4 *Johns. Ch. Rep.* 150. 160.) and shown to be a principle of the common law, that if one had a ferry by prescription, and another erected a ferry so near it, as to draw away its custom, it was a nuisance, for which the injured party had his remedy by action. The same law and remedy were applied to the case of a fair or market, in which an individual had a freehold interest, if

1821.

NEWBURGH
TURNPIKE Co.
v.
MILLER.

Where one has a grant of a ferry, bridge, or road, with the exclusive right of taking toll, the erection of another ferry, bridge, or road, so near it, as to create a competition, injurious to the franchise, it is in respect to such franchise, a nui-

sance. And this court will grant a perpetual injunction, to secure the enjoyment of such statute franchise, and prevent the use of the rival establishment.

another fair or market was erected or used within its vicinity. The same doctrine applies to any exclusive privilege created by statute: all such privileges come within the equity and reason of the principle; no rival road, bridge, ferry, or other establishment of a similar kind, and for like purposes, can be tolerated so near to the other as materially to affect or take away its custom. It operates as a fraud upon the grant, and goes to defeat it. The consideration by which individuals are invited to expend money upon great, and expensive, and hazardous public works, as roads and bridges, and to become bound to keep them in constant and good repair, is the grant of a right to an exclusive toll. This right, thus purchased for a valuable consideration, cannot be taken away by direct or indirect means, devised for the purpose, both of which are equally unlawful.

But it has been contended, that the plaintiffs were bound by the act of 1815, to remove their gate from the *Wallkill* bridge. The words of the act are, " that it shall and may be lawful" for the president, directors, and company, to remove the toll-gate, &c. and to demand an increased rate of toll at the first gate west thereof. These words were applied to the trustees of a private company, and the better construction is, that it was intended as a matter of accommodation to the plaintiffs, to allow them to remove one gate, and increase their rate of toll at another. The increase of the toll was intended as a compensation for the removal of the gate; but the statute seems to have intended to leave it to their discretion, whether or not they would avail themselves of the permission. A peremptory and imperative interference of that kind, with a vested private right, is not to be inferred, when it is not expressly declared. Until the plaintiffs have accepted of the modification proposed, either by voluntarily removing the gate from the bridge, or by demanding the increased toll at the next gate, all their former rights are to be deemed unimpaired, and as continuing in

full force. Lord *Hardwicke* observed, in *Stamper* v. *Miller*, (3 *Atk.* 212.) that the words *shall* or *may*, when applied to private trusts, leave an election to the trustees, which is not the case when the words are used in acts of parliament. And in respect to statutes, the rule of construction seems to be, that the word *may* means *must* or *shall* only in cases where the public interest and rights are concerned, and where the public or third persons have a claim, *de jure*, that the power should be exercised. Thus it was held in *Alderman Backwell's case*, (1 *Vern.* 152.) that the Chancellor was bound to grant a commission of bankruptcy, on due application and proof, though the words of the statute were that he *may* grant. The creditors had an interest in the application of the power. So, in the case of the *King* v. *Barlow*, as it is reported in *Salkeld*, (for in *Carthew* the distinction is not noticed,) the K. B. construed the words *shall* and *may*, as being mandatory " where the statute directs the doing of a thing for the sake of justice, or the public good." In that case, (2 *Salk.* 609. *Carth.* 293.) the churchwardens were indicted for not making a rate or assessment, under the statute of 14 *Car. II.* ch. 12. sec. 18., for the reimbursement of some constables. The statute said, they " shall have power and authority to make a rate," and the statute was construed to be peremptory, and the constables had an interest in the exercise of the power. The Court observed in that case, that the stat. of 23 *H. VI.* said, that the sheriff *may* take bail, which was construed he *shall*. A similar decision was made in the case of the *King* v. *Inhabitants of Derby*, (*Skinner*, 370.) where it was said, that *may*, in the case of a public officer, was tantamount to *shall*. The illustration, in one of those cases, taken from the statute of 23 *H. VI.* was rather unfortunate, for the words of that statute were imperative. The sheriff " *shall* let out of prison, &c. upon reasonable sureties," &c. But the principle to be deduced from the cases, is, that whenever an act to be done under a statute,

*Margin notes:*

1821.

NEWBURGH
TURNPIKE Co.
v.
MILLER.

The words "shall or may," in a private trust, leave it optional with the trustees.

The word "may," in a statute, means *must* or *shall* only in cases where the public interest is concerned, and the public or third persons have a claim, *de jure*, that the power should be exercised.

is to be done by a public officer, and concerns the public interest, or the rights of third persons, which require the performance of the act, then it becomes a duty in the officer to do it. But that doctrine has no necessary application to a case like the present, where the power is conferred on trustees, upon their own application, as it is to be presumed, and who are not public officers, and where neither the public nor third persons have any rights, directly or immediately, concerned in the case. This is more like the case mentioned by Lord *Hardwicke*, of a power conferred upon trustees, for purposes of a private or personal nature; and at any rate, until the plaintiffs either voluntarily relinquish their gate upon the bridge, or are duly convicted by the judgment of a Court of law, of usurping or unlawfully holding that particular privilege or franchise, (and such a jurisdiction does not belong to this Court,) I shall deem myself bound to regard them as in the lawful exercise of a right.

The decision of the judges of the Court of Common Pleas is very material, (not indeed in respect to the rights of the plaintiffs, which it was not in the power of the commissioners of highways to affect or impair,) but in respect to the justice and equity of the case. The judges, upon appeal, had a view of the ground, and heard the allegations and proofs of the parties, and they adjudged that the new road and bridge were unnecessary and inexpedient. This decision is evidence of the unreasonableness of the disturbance, of which the plaintiffs complain. They are now contending against a private road, which not only greatly annoys them in the quiet enjoyment of their privilege, conferred for beneficial purposes, and purchased for a valuable consideration, but which has been judicially declared to be unnecessary and inexpedient.

The plaintiffs are, accordingly, entitled to a perpetual injunction against the use of the road and bridge, opened by the aid of the defendants. The trustees of the *German* church are entitled to the land which was granted by them

to *Fowler*; for the condition of the grant has failed, and the title reverts back to them, and they ought to reclaim that land from the unwarrantable use to which it has been applied.

1821.

NEWBURGH
TURNPIKE Co.
v.
MILLER.

Question as
to damages and
costs.

With respect to the damages claimed by the plaintiffs, for the loss of toll, and with respect to the question of costs, the act of 1815 is entitled to consideration, as having an influence upon those questions. I can easily suppose that the defendants acted under a misapprehension of right, when they lent assistance to *Fowler*, in the erection of the bridge, and made a grant to him of the road west of the *Wallkill*; and I think that the act of 1815 raised a fair presumption, that the plaintiffs intended to avail themselves speedily of the permission thereby granted. If it had not been their intention, it is difficult to perceive a motive for passing the act, for I have no doubt it was passed upon their suggestion. The plaintiffs, since that time, have not paid very vigilant attention to their bridge, and this must have strengthened the presumption. Nor does it appear that the plaintiffs made any objection to *Fowler's* bridge, while it was building, or gave any notice of their intention to oppose the use of it. Under all these circumstances, I am not inclined to make the defendants responsible for the loss of toll occasioned by the use of *Fowler's* bridge. They have disclaimed all concern in the act of opening the road, after it had been closed by the plaintiffs. The damages must be very uncertain, and every thing that was said on that subject by the witnesses was mere guess and conjecture. I do not think the plaintiffs have laid a strong foundation for the assistance of this Court, in respect to damages, or shown any reasonable *data*, by which they might be accurately and safely assessed. The defendants have, likewise, shown too much colour of excuse, for the assistance they afforded to *Fowler*, and the plaintiffs have been too inattentive spectators of the formation of the bridge and road, during the long time that the business

was going on, to justify me in punishing the defendants with the costs of this suit.

The following decree was entered : " It is declared that the plaintiffs are in the lawful possession of the gate and turnpike, erected upon the bridge over the *Wallkill*, and in the pleadings mentioned, and are entitled to the exclusive enjoyment of the toll, for passing the said bridge, given to them by the acts in the pleadings referred to, of the 20th of *March*, 1801, and of the 28th of *February*, 1806 ; and that the permission given to the plaintiffs by the act of the 17th of *March*, 1815, also, in the pleadings mentioned, to remove the toll-gate from the said bridge, was not intended to be compulsory upon them to remove the said toll gate, nor to impair their previous right to ask, demand, and receive *toll* at the said bridge, until they should, by their own voluntary act and consent, have removed the said toll-gate. And it is further declared, that the erection of the bridge denominated, in the pleadings and proofs, *Fowler's* bridge, and the opening of the road therefrom, west of the *Wallkill*, and leading to the turnpike road of the plaintiffs, enables persons travelling upon the road of the plaintiffs to avoid the toll-gate, and to re-enter upon the road within a shorter distance than a mile from the place at which they had quitted it, and consequently the said bridge, denominated *Fowler's* bridge, and the road leading therefrom as aforesaid, are an unjustifiable and unlawful interruption and disturbance of the plaintiffs, in the enjoyment of their statute right and privilege, to demand and receive toll as aforesaid. And it is further declared, that the defendants, by having afforded aid towards building *Fowler's* bridge, and such of them as were trustees of the Reformed *German* church, by having granted land for the sole purpose of the said road, have been and are still contributing to the said injury to the plaintiffs. It is thereupon ordered, &c., that the defendants, and all persons by, from, or under them be enjoined, so long as the plaintiffs shall continue the toll-

gate on their bridge as aforesaid, from using, or suffering, or permitting to be used, as a road for public use or travel, *Fowler's* bridge aforesaid, or the road there from, west of the *Wallkill*, and leading to and from the said turnpike road over land belonging to the trustees of the Reformed *German* church, and which land hath reverted to them upon failure of the condition upon which the same was granted by them to *Francis Fowler.*   And it is further ordered, &c., that the said road last mentioned be forthwith, upon service of a copy of this decree upon the said trustees, by them closed up so far as to hinder persons travelling upon the turnpike road of the plaintiffs, from using the same and *Fowler's* bridge connected therewith, to the avoidance of the toll-gate aforesaid, on the bridge of the plaintiffs. But inasmuch as it does not appear that the defendants acted with any fraudulent or malicious intent to injure the plaintiffs, in the lawful enjoyment of their rights, but rather from a misapprehension of their own rights in that respect: And inasmuch as the act of the 17th of *March,* 1815, afforded a reasonable permission, that the plaintiffs intended, in due season, to avail themselves of the permission thereby granted to them, (for otherwise that presumption was granted without any notice,) and as the plaintiffs do not appear to have made any objection or opposition to the new bridge and road, during the period the same were making, it is thereupon further declared, that the plaintiffs have not shown sufficient ground for the equitable interposition of this Court, to charge the defendants with the uncertain damages which the plaintiffs may have sustained in the loss of toll, or to charge them with the costs of this suit.   It is thereupon further ordered, &c., that no costs of this suit be allowed to either party, as against the other."