WHITE'S CREEK TURNPIKE COMPANY *v*. DAVIDSON COUNTY and B. W. PRICE.

## October Term, 1877.

SHUN-PIKE — INJUNCTION — INTENTION. — It having been settled in this state that the Chancery Court should, through its injunctive process, perpetually enjoin the opening of a road by the County Court, the object and end of which would be to evade the payment of tolls on a chartered turnpike road, a temporary injunction granted upon the filing of the bill will not be dissolved on an answer by the County Court denying that the road was intended merely as a shun-pike, the *quo animo* being immaterial if the fact exist; and this although the proposed road do not intersect the turnpike at all.

CORPORATION — LEGISLATIVE RECOGNITION. — After repeated recognitions of the existence of a turnpike corporation up to and inclusive of the last session of the Legislature, a collateral impeachment of its existence based on preëxisting facts cannot be entertained.

CONSTITUTIONAL LAW — OBLIGATION OF A CHARTER. — An act of the Legislature which undertakes, " by virtue of the police power of the state," to

require an incorporated turnpike company, whose gates have been located in accordance with the terms of its charter, to set back its first gate at least two miles from the corporate limits of a town which has grown up at one of the *termini* of the road, and the second gate at least five miles from the first, under the penalty, on failure, of forfeiting all right to demand or receive tolls on said road, is unconstitutional and void.

*A. S. Colyar, Demoss & Malone*, for plaintiff.

*H. S. Foote, Quarles & Thoma*, for defendants.

The bill in this case was filed August 18, 1877, to enjoin the county of Davidson, and Price as its employee, from opening a road under an order of the County Court, upon the ground that it was being opened as a shun-pike, and to enable persons to avoid the payment of tolls at the first gate on the complainant's road. A temporary injunction was granted when the bill was filed. The defendants have answered, and now move to dissolve the injunction.

Under a charter granted by the Legislature in 1830, amended, renewed, and extended from time to time, the White's Creek Turnpike Company was organized by the subscription of stock to the amount of $28,000, completed their road, which was accepted by commissioners appointed for the purpose, and entered upon the exercise of its franchises as early as 1846. The road commenced near the eastern end of the old bridge across the Cumberland at Nashville, extended northwardly about twelve miles, and had two gates upon it at which toll was taken. This road, in common with nearly all other turnpike roads leading into Nashville, was, at the close of the civil war, in a ruinous condition. On May 24, 1866, the Legislature, by private act, ch. 111, entitled "An act to amend the charter of the White's Creek Turnpike Road, and for other purposes," granted permission to the White's Creek Turnpike Company to locate their first gate as provided by an act passed on October 2, 1832, amendatory of the original charter. The act thus referred to authorized the company to locate its first gate at any point not within one mile of the Nash-

ville Bridge. The gate was accordingly erected at a point a little beyond a mile from the bridge, and toll has been taken thereat until it was destroyed by fire in June of this year. The point is at the intersection of the road with the road of the Louisville Branch Turnpike Company, but between the intersection and the Nashville *terminus*, so that all persons passing over the Louisville Branch Road to Nashville were compelled to pay toll at this gate. The land adjacent to this gate, both above and below the gate, and extending along each turnpike, belonged to Lucy L., the wife of Van S. Lindsley. In the year 1874, Lindsley and wife opened an avenue through this land from the town of Edgefield, which has grown up around the *terminus* of the White's Creek Turnpike, and extended its corporate limits to within half a mile of the toll-gate. Lindsley Avenue begins at the edge of the town, and runs parallel with the White's Creek Turnpike, at a distance of about 220 yards, to a point just beyond the toll-gate; then turns at right angles toward the turnpike, so as, if continued for the 220 yards, to strike the turnpike road immediately beyond the gate. The turnpike company owned a small strip of land extending from the gate-house in front of the proposed avenue, and placed obstructions upon it so as to close up the mouth of the avenue. Thereupon, the Lindsleys again turned their avenue, and ran it about ninety feet, to the Louisville Branch Road. The result is that, without touching the White's Creek Road, the avenue opened a new way from the Louisville Branch Road to the town of Edgefield and city of Nashville, so that persons travelling that road to those cities could, by following the avenue, avoid the payment of tolls at the first gate of the White's Creek Turnpike Company. To prevent this, the said company, on October 20, 1874, filed its bill in this court against Lindsley and wife, to enjoin the opening of the avenue, upon the ground that it was merely a shun-pike, and obtained a temporary injunction to that effect. Such proceedings were had in the case that, on July 12, 1875, a final decree was

rendered in favor of the company making the injunction perpetual. At the July term, 1877, of the County Court of Davidson County, upon petition of citizens, the court ordered Lindsley Avenue, as it had been previously laid out as aforesaid, to be made a public road, and appointed the defendant Price as overseer thereof, who was proceeding to work on the proposed road when this bill was filed and injunction granted as aforesaid.

The foregoing facts are stated in the bill, and admitted by the answer of the defendants. It is also conceded in argument by the learned counsel of the defendants that, if the proposed avenue be a shun-pike, and merely intended to enable travellers to avoid the payment of tolls at the complainant's gate, this court has jurisdiction to enjoin its being opened. The law was so settled in the case of the *Franklin and Columbia Turnpike Company* v. *The County Court of Maury County*, 8 Humph. 342, in which I was of the counsel on the losing side. The power to open roads, it is there said, is a prerogative of sovereignty delegated by the Legislature to the County Courts, and is executed by them not as a judicial but municipal function. The decision is that if the only object and end of a proposed road would be to evade the payment of tolls on a chartered road, the order of the County Court would be unlawful, and the Court of Chancery should, through its injunctive process, annul it. It was conceded by the Supreme Court in that case that the party aggrieved by the action of the County Court might, if advised in time, although not bound to do so, intervene in that court and resist the application. This was done, and done successfully, in the analogous case of *The Nashville Bridge* v. *Shelby*, 10 Yerg. 280, where the County Court undertook to establish a ferry — a power also delegated to that court by the Legislature — in order to enable persons to avoid the payment of tolls by crossing the Nashville Bridge.

It is urged, however, on the part of the defendants, that

the road must be merely intended to be a shun-pike to bring it within the decision, and that here the County Court has, in its answer, denied any such intention. There can be no doubt, said the court, in the first of the cases above cited, that the road was established for the purpose of avoiding the gate, "for the turnpike is also a public road, and a nearer and a better one than that established by the County Court." The Nashville bridge, said the court in the second case, is capable of transporting at all times, safely and without delay, all persons and all effects that require transportation. A ferry would transport persons and effects with more delay and with less safety. "Public convenience, therefore, does not demand the establishment of a ferry, unless it could be called a public convenience to reduce, by competition, the tolls of the bridge below the amount conceded by the public to the bridge company in the charter of corporation. And surely this cannot be insisted on. In language it would be a solecism; in act it would be bad faith." It was on account of the fact that the reception of tolls, under the legislative grant, was interfered with that the act of the County Court in both these cases was held to be illegal. The intent was not inquired into, except as connected with the act. "The *quo animo*," says Chancellor Kent, "is not an essential inquiry in the case." *Newburgh Turnpike Co.* v. *Miller*, 5 Johns. Ch. 111. The very best intentions will not prevail to validate an illegal act. *Primâ facie*, in the case before us, upon the facts stated in the bill and admitted in the answer, the proposed new road was established to avoid the gate, "for the turnpike is also a public road, and a nearer and better one than that established by the County Court."

The learned counsel for the defendants suggest, however, that there is a distinction between the case in 8 Humph. and the one now before us, in this: that the alleged shunpike in that case was made to enter the turnpike between

the gate and the town of Columbia, whereas in this case the proposed new road does not touch the complainant's turnpike at all. It is obvious, however, that the fact. alluded to in the first case was a mere incident, and not the point of the decision. The injury to the franchise is the gist of the party's right, and if such injury can be inflicted without intersecting the road, the remedy would be the same. " If the new road," says Chancellor Kent, " by its *termini* and its vicinity, creates a competition injurious to the statute franchise, it becomes what is deemed in law, in respect to such franchise, a nuisance." *Newburgh Turnpike Co.* v. *Miller*, 5 Johns. Ch. 111. The principle was applied, he says, at common law, to a ferry or a market interfering with a ferry or market by prescription. " The same doctrine," he adds, " applies to any exclusive privilege created by statute ; all such privileges come within the equity and reason of the principle ; no rival road, bridge, ferry, or other establishment of a similar kind, and for like purposes, can be tolerated so near to the other as materially to affect or take away its custom. The consideration by which individuals are invited to expend money upon great, and expensive, and hazardous public works, — as roads and bridges, — and to become bound to keep them in constant and good repair, is the grant to the right of an exclusive toll. This right, thus purchased for a valuable consideration, cannot be taken away by direct or indirect means, devised for the purpose, both of which are equally unlawful." Accordingly, he applied the principle in *Ogden* v. *Gibbons*, 4 Johns. Ch. 150, to the protection of Fulton's exclusive right of navigating boats by steam in the New York waters. And our Supreme Court applied it in the Nashville Bridge case, to the protection of the bridge franchise against a ferry which did not intersect or touch the bridge, or the bridge way.

The answer suggests that the turnpike between the gate and its *terminus* in Edgefield is sometimes overflowed by

the river, and that the new road is above overflow. This is new matter not responsive to any thing in the bill, and cannot, of course, be noticed upon a motion to dissolve the injunction upon bill and answer, which answer admits the facts upon which the equity of the bill rests. Besides, it appears from the bill and answer that, on a bill filed by the present complainants against the Lindsleys, this court has adjudged that the proposed road was a shun-pike, and perpetually enjoined them, then and now the owners of the land, from opening the road. The point is *res adjudicata* so far as they are concerned, and all persons claiming under them. *Vaughn* v. *Law*, 1 Humph. 123. The County Court cannot lay off the avenue as a public road except by claiming under them, either by their consent or by condemning and paying for the land. And, clearly, the road is not less a shun-pike merely because the County Court has ordered it to be opened. It must be held to be, as it has been decreed to be, a shun-pike until a state of circumstances occurs sufficient to justify its opening, which did not exist when the decree was rendered. No such change of circumstances is shown in the answer of these defendants. And public convenience does not demand its establishment, so far as appears, " unless it can be called public convenience " to deprive the turnpike company of tolls conceded in the charter of incorporation. But this, says our Supreme Court, would be " in language a solecism, in act bad faith."

The answer states that, by an act of March 19, 1858, ch. 70, sec. 12, the Legislature authorized the White's Creek Turnpike Company to sell its road, and convey it to the purchaser, with all the rights and privileges of receiving toll thereon then belonging to the company, and the other rights and privileges appertaining to said company, the purchaser to be liable, in the management of the road, to all the restrictions and penalties to which the company would be subject; that, under this act, the company did sell to two individuals, — one of them afterwards, in 1865, becoming

sole owner; that it was long after the passage of the act of 1866, authorizing the present location of the first gate, before this sole owner undertook to assign stock to his friends, and thus reorganized the company. Upon these facts, it is argued that the corporate existence of the company became merged in the sole owner and ceased to exist, and, therefore, that the act of 1866 was of no validity because there was no company to accept it. But the answer also shows that, besides the legislative recognition of the existence of the company by the act of 1866, the Legislature also recognized it in 1868 by an amendment of the charter, and again in 1877 by an act presently to be noticed. After such repeated legislative recognitions of the existence of the company up to the present day, a collateral impeachment based upon facts touching its internal organization cannot be entertained. *Williams* v. *Union Bank*, 2 Humph. 339. If the company, by reason of the supposed merger in 1865, ceased to exist for any purpose, the remedy is by a direct proceeding, under our statutes, in the name of the state, to ascertain by what right particular franchises are used, or to declare a forfeiture. *Mackall* v. *Chesapeake, etc., Canal Co.*, 94 U. S. 308. Besides, I do not understand the law to be, as the argument assumes, that the transfer of the corporate franchise to a single individual, under legislative authority, destroys the existence of the corporation. A single individual may be made a body corporate, either by an original charter or by a subsequent amendment, and for the purpose of building or running a turnpike. Our statute-books are full of such instances, one of them being in the act of February 5, 1842, ch. 166, amending and extending the charter of this very road. By the fourth section of that act, Thomas J. Munford, of the county of Wilson, is "constituted a sole corporator" for the purpose of constructing a turnpike road. There is nothing in this objection. In this connection, it may be noticed that the answer denies that the company accepted the act of 1866. But

this denial is based upon the supposed legal effect of the merger of the corporate rights in one man. That the provisions of the act were in fact adopted, by the location of the gate and the receipt of tolls for years, is admitted. The denial is, consequently, a mere inference from an erroneous opinion of the law, and is outweighed by the stubborn fact of actual acceptance.

Both the bill and the answer note that the Legislature, on March 16, 1877, passed an act entitled "An act to set back toll-gates on White's Creek Pike." This act, after reciting, by way of preamble, several of the facts touching the White's Creek Turnpike Company herein before noticed, undertakes, as it says, "by virtue of the police power of the state," to require the company to remove back its first gate at least two miles from the corporate limits of Edgefield, and the second gate at least five miles from the first, under the penalty, on failure, of forfeiting all right to demand or receive toll on said road. The act does not purport to be an amendment to the charter of the company, nor has it been treated as such in the argument, nor has it been claimed that the company has accepted it as an amendment. The argument on behalf of the defendants is that the act is a law within the police power of the state, which the Legislature could constitutionally pass, and which the company were bound to obey or lose all right to take toll. In this view, the company would have no interest in the question of the new road. The rights of the parties, therefore, turn upon the validity of the act in question.

Charters of incorporation, says Mr. Cooley, which are granted, not as a part of the machinery of government, but for the private benefit or purposes of the incorporators, are contracts between the Legislature and the incorporators, based for their consideration on the liabilities and duties which the corporators assume by accepting them; and the grant of the franchise can no more be resumed by the Legislature, or its benefits diminished or impaired without the

consent of the grantees, than any other grant of property or valuable thing, unless the right to do so is reserved in the charter itself. Cooley's Const. Lim. 279, citing a large number of cases. " Ever since the determination of the great case of *The Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518," says Judge Turley, " it has been considered as settled beyond controversy that a charter of incorporation is a contract, and that any statute altering it in a material respect, without the consent of the corporation, is a law impairing the obligation of the charter, and is unconstitutional and void." *Union Bank* v. *The State*, 9 Yerg. 494. " If it were otherwise," he emphatically adds, "' there would be no safety in times of excitement, under our form of government, for the most sacred rights." And it can make no difference whether the excitement pervade the state, so as to influence a constitutional convention or legislature, or the fraction of a county, so as to sway local legislation. In either case, the *ægis* of the Constitution is thrown over the individual citizen or corporation as a protection against lawless confiscation.

The counsel of the defendant do not deny these elementary principles, but insist that there is an exception in the exercise of the police power of the state. And, undoubtedly, a corporation, like an individual citizen, takes its rights and franchises subject to the regulating control of the Legislature. " The limit," says Mr. Cooley, " to the exercise of police powers in these cases must be this : the regulations must have reference to the comfort, safety, or welfare of society ; they must not be in conflict with any of the provisions of the charter ; and they must not, under pretence of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments to the charter in curtailment of the corporate franchise." Cooley's Const. Lim. 577. Accordingly, where a corporation was chartered with the right to take toll from passen-

gers over their road, a subsequent statute authorizing a certain class of people to go toll-free was held void. *The State* v. *Martin*, 1 Tenn. Leg. Rep. 374 ; *Pingrey* v. *Washburn*, 1 Aik. 268. And where a turnpike was authorized by its charter to locate its gate at a particular place, which was done, a subsequent act requiring them to remove the gate was held to be unconstitutional and void, though in the meantime a village had grown up and around the gate. *Attorney-General* v. *Germantown & Philadelphia Turnpike Co.*, 55 Penn. 466. *A fortiori*, if, as in the case before us, the village is not less than half a mile from the gate.

It is argued that the exercise of a right, lawful in its inception, may become a nuisance, and liable to abatement as such. If the position be conceded, there is nothing disclosed by the record to bring this case within its operation. The taking of tolls under a legislative grant, however unpalatable their payment may be to the citizen, is not a nuisance in law. The decisions, as we have seen, are directly the reverse, — that it is a nuisance to resort to a device to avoid their payment, and that the exercise of an undoubted power by a court, if it tend to this result, will be enjoined by this court upon that very ground. Besides, the abatement of a nuisance is clearly not a legislative but a judicial act. It can only be done by legal proceedings according to the law of the land, in which the supposed offender will have an opportunity to be heard, not by a legislative fiat. All that the Legislature can do under our Constitution is to declare, by a general law, what is a nuisance. The application of the law in the determination of private rights belongs exclusively to the courts.

By the Constitution of 1870, art. II., sec. 1, the powers of the government are divided into three distinct departments, — the legislative, executive, and judicial ; and by section 2 no person belonging to one of these departments is permitted to exercise the powers properly belonging to either of the others, except in cases directed by the Constitution

itself. By article VI., section 1, the judicial power of the state is vested in the courts. By article I., section 8, of our Bill of Rights, no person can be deprived of his privileges or property " but by the judgment of his peers or the law of the land." All these provisions have been contained in each of the three constitutions adopted since the organization of the state government, and repeatedly passed upon by the courts. " It is clear," says Judge Green, in *Jones* v. *Perry*, 10 Yerg. 69, " that the Legislature of this state cannot rightfully exercise a judicial power." The clause " law of the land," in our Bill of Rights, the courts have repeatedly and invariably said, means a general public law, equally binding upon every member of the community under similar circumstances, and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. *Wally* v. *Kennedy*, 2 Yerg. 554, and cases there cited in the head-note, new edition. " Nor is there," says the court, in *Jones* v. *Perry*, " a single provision in our Constitution more salutary in its character, or that demands in its enforcement the exercise of greater vigilance and energy." In *Jones* v. *Perry*, the Legislature had undertaken to authorize the guardians of infants to sell their real estate for the payment of their ancestor's debts, and a sale was made accordingly, which the court set aside as void. " Is the act under consideration," ask the court, " of a judicial character?" It does not partake of the character of a law, for it formed no rule of action of that permanent, uniform, and universal character which constitutes the fundamental principle of municipal law. What is it, then, but a judicial decree? It was enacted upon the avowed ground that the estate of the deceased was indebted. " What does it do, then, but adjudge the existence of the debts, and decree that the land be sold for their payment? It is, to be sure, in form of law, but we are unable to see how it differs in substance from a judicial decree; and if

it is in substance a judicial decree, the form in which its makers have thought proper to clothe it cannot alter its character."

The act before us undertakes to deprive the White's Creek Turnpike Company of the valuable franchise, acquired under previous legislative grant, of taking toll at its first gate. It does so, not by a general law directed to all turnpikes in like situation, but by a special provision pointed at this company alone, and upon a legislative adjudication that it has become amenable to the police power of the state. It is in plain violation of those fundamental principles of the Constitution which confine the judicial power of the state to the courts. It is not even in form of law, but a special act or edict for a particular purpose, and that purpose the destruction of a private right, without a hearing.

I close with the words of wisdom of one of our sages of the law: "If, when the public mind is quiet, and public opinion sustains the courts in the dispassionate and impartial exercise of its supervisory power, precedents of constitutional violation shall not be permitted to take effect, we may hope that each department of government, accustomed to move in its legitimate sphere with uniformity and harmony, will not readily run into excess, even in times of excitement and party strife. Public opinion, too, accustomed to yield to the authority of judicial decisions, and to sustain the courts even when they arrest the operation of a legislative act, will acquire a wholesome morality and a firm tone, by which the courts will feel sustained and encouraged in the discharge of their duty, should the time ever come when the sanctuary of justice will be the last hope of the oppressed. Every case, therefore, where the constitutionality of a legislative act is drawn into question, is a grave and important matter; and while, on the one hand, the courts ought to entertain for the Legislature the highest respect, and to decide against their acts only from the clear-

est convictions of duty, on the other hand, where they are clearly satisfied the Constitution is violated, they have no other alternative but to declare that such act of Assembly is not law." *Per* Green, J., in *Jones* v. *Perry*, 10 Yerg. 72.