# THE MAYOR AND COUNCIL OF THE CITY OF COLUMBUS v. RODGERS, et al.

1. The city of Columbus, in Georgia, incorporated by an act of the Legislature of that State, in virtue of its corporate powers, erected a bridge acroas the Chatahoochie river, the western bank of which is in Alabama ; afterwards, the Legislature of the latter State passed an act, reciting that the western abutment of the bridge rested upon the lands of D. M. and others, and thereupon enacted, that the parties whose lands were thus encroached upon, and their assigns, were authorized to make and erect all things necessary to the permanent erection of the western abutment, on their own lands; that the bridge as then located should be permanent, that no person should be authorized to erect a bridge, or attach an abutment to the western bank of the Chatahoochie, nor establish any bridge or ferry within two miles thereof: *Further*, if any one shall establish a bridge or ferry, in violation of this prohibition, he shall pay twenty dollars for every day he shall keep the same in operation.   Upon the payment by D. M. and others, and their associates of one half the value of the bridge erected by the city, then they were authorized to receive at the western abutment toll, the rates of which were prescribed.   D. M. and others conveyed to the city of Columbus, not only the land on which the western abutment rested, but the privileges and immunities conferred by the statute.   Afterwards, the Commissioners' Court of Revenue and Roads of Russel county, ordered that a gate be erected immediately west of the bridge, and that toll be required of all persons passing over *any of the bridges of that county,* fixed rates of toll, and caused the gate thus erected to be leased, &c.   *Held*—1. That although the city of Columbus was a foreign corporation, its purchase from D. M. and others, invested it with the priv-

ileges and immunities conferred by the act of the Alabama Legislature. 2. That the order of the Court of Revenue and Roads, and consequent proceedings, was an invasion of the franchise thus acquired. 3. That it was competent for a court of chancery to protect the rights of the city, by injoining the collection of toll by the lessee of the gate, and by causing the same to be abated; and this although the statute imposed a penalty for a violation of one of its provisions. 4. That the city might file a bill in its corporate name, without making the Attorney General or the State of Alabama a party complainant.

Writ of Error to the Court of Chancery sitting in Russel.

THE plaintiffs in error alledge in their bill, that the city of Columbus was first incorporated by the Legislature of the State of Georgia, by the name of the Intendant and Commissioners of the Town of Columbus, and "vested with certain powers, privileges and immunities," among which was the right to hold real estate, to construct a bridge across the Chattahoochie, at or near the city, and have the exclusive right of demanding and receiving tolls for passing over the same. Afterwards, the corporate name was regularly changed to "The Mayor and Aldermen of the city of Columbus," with a continuation of the powers and privileges conferred by the first enactment.

In 1833, the complainants, at great expense, caused a bridge to be erected at the place designated—the eastern abutment being in the city of Columbus, and the western in the town of Girard, in Russell county, Alabama; since which time, up to the hindrance complained of, complainant has exercised exclusive control, and received the established tolls for crossing the same.

Previous to building the bridge, Daniel McDougald and others caused the town of Girard to be laid off into lots, upon a tract of land of which they were proprietors, known as "Marshall's reserve," with streets through the same. These lots were sold to individuals, and the streets have been used as public highways. The principal street was from the western abutment of the bridge, due west through the town, and is the only one by which the bridge can be approached; the

town is incorporated, and no overseer has for a long time been appointed by the county of Russell over this street.

In the year 1834, the Legislature of Alabama passed an act authorizing Daniel McDougald and others, proprietors of the land on which the western abutment was located, and their assignees to take tolls there. Afterwards, in the same year, McDougald and others sold this land, and the privilege of receiving tolls, as conferred by the act, to the complainants, and made a deed by which they transferred the land and the franchise.

The Commissioners' Court of Revenue and Roads of Russell county, at a regular term thereof, on the second Monday of March, 1846, ordained that a gate be established on the street running west from the bridge, and that toll be required of all persons passing over any of the bridges in that county; and at the same time provided for the disposition of the gate, fixed the rates of toll, &c. Afterwards, the court leased the gate to the highest bidder, when William Rodgers became the lessee, and on the 16th March erected a gate at the western abutment of the bridge, completely obstructing the street and preventing the approach of the bridge from the west. The lessee is demanding toll from all persons who cross complainant's bridge, except the citizens of Russell county, and unless it is paid he refuses to permit them to proceed—and this whether they have passed over any bridge in the county or not.

The Commissioners' Court have not caused to be constructed any bridge, so as to make the establishment of the gate necessary, at the place where it is located. It is therefore charged, that the gate has been erected to obstruct the street, so as to injure the complainant in the enjoyment of their rights; and that it is not only to the prejudice of their rights, but to the "annoyance, molestation and damage of the citizens both of Georgia and Alabama"—in fact it is a common nuisance.

The bill prays that the Judge of the County Court and the Commissioners of Revenue and Roads, who are designated by name, and Rogers, the lessee, may be enjoined from all further proceedings under the order, from collecting toll at the gate erected, or any other that may be placed across

that street; that the gate may be abated, and such other relief as is proper be granted, &c.

An injunction was granted accordingly, but afterwards, upon motion of defendants, the bill was dismissed for want of equity, and ordered that the complainant be taxed with the costs.

J. W. PRYOR and S. F. RICE, for the plaintiff in error, made the following points: 1. The gate erected under the authority of the Court of Revenue and Roads is a public nuisance. [5 Porter's Rep. 312; see Clay's Dig. 512, $ 24; 513 $$ 25, 26.] The act of the Alabama Legislature passed in 1834, when accepted by McDougald and his associates, and the sale and assignment was made thereunder, operated as a contract, so that neither the court nor the legislature could have divested or abridged the benefit which the act conferred. In this view, the gate was not only a violation of the private rights of the complainant, but operated as a public nuisance. [13 Pick. Rep. 169; 22 Id. 333, 353.]

2. The commissioners' court of Russell has not power to order or authorize the erection of a toll gate; and if it possessed such a general power, could not exercise it in an incorporated town, whose streets have been dedicated to the public use, and are under the supervision of the corporate officers. [6 Pet. Rep. 431.]

3. The acts of the Georgia and Alabama legislatures—the conveyance by McDougald and others, and the exercise of the right there conferred upon the complainant, vested an unquestionable right; for the protection of which an injunction is the proper remedy. [2 Stew. Rep. 211; 1 Johns. Ch. R. 611, 615; 5 Id. 101, 110; 6 Id. 439; 2 Story's Eq. 204; Eden on Inj. 162-3; 4 Paige's Rep. 510, 514; 12 Gill & J. Rep. 1, 12, 91, 129; 16 Pick. Rep. 512; 5 Porter's Rep. 313.]

4. An action at law would afford an incomplete remedy— it might compensate the party injured for the past, but it could not prevent a repetition of the grievance. See 13th and 22d Pick. *supra*.

5. The right of the complainant to receive the tolls need not be ascertained by suit at law, to authorize the interference of equity. All the facts appear upon paper, and must,

upon a motion to dismiss, be taken to be true—they cannot be controverted otherwise than by answer; and until this comes in, it cannot be known that any fact will be controverted. [Eden on Inj. 168; 2 John. Ch. Rep. 162, 165; 5 Porter's Rep. *supra.*]

6. It is not admitted that the State should have been made a party to the bill; but if this was necessary it is insisted the bill should not have been dismissed, but retained that the proper parties might have been made. [12 Gill & J. Rep. *supra.*]

J. E. BELSER and S. HEYDENFELDT, for the defendant. It is admitted that a corporation created in another State may sue here, (2 Stew. Rep. 147,) and it may file a bill to restrain an interference with its chartered privileges; but it cannot be a common informer. [2 Strange's R. 1240; 2 Paige's R. 116.] Notwithstanding the terms of the act of 1834, in favor of McDougald and others, it did not authorize these persons to transfer their interest in the subject to the complainant. [13 Vin. Ab. 503, § 1.] A foreign corporation can't hold real estate here—nor can it exercise a franchise without the State to which it owes its creation. [1 Stew. Rep. 299; 5 Porter's Rep. 279; 2 Paige's R· 116.]

The act of the Alabama Legislature makes the collection of tolls at the west end of the bridge a franchise; if a party not authorized to receive them, usurps it, the remedy against him is by *quo warranto,* and not by a proceeding to restrain or punish for a nuisance. [7 Com. Dig. *Quo warranto,* (A.) 190; 6 Vin. Ab. 293, § 6; 312, § 2; 13 Id. 513, § 6; 2 Ala. Rep. 140.] But if it be a nuisance, redress should be sought by action at law, and a court of equity has no jurisdiction. [4 Wend. Rep. 9; 9 Wend. Rep. 315; 7 Porter's Rep. 238.]

The grant to McDougald enabled him to put the abutment upon *his own land,* but the street on which the abutment now rests, was, before the grant, dedicated to the public use, and does not come within the terms of the act. [Chardon's Droits D. Alluvion, chap. 5, § 159.]

If one person has sustained special damage by a *public* nuisance, he may redress it by an action against the party

6

who erected it; but the guilty person should, except in this instance, be proceeded against criminally, so as to abate the nuisance and punish him. [12 Pet. Rep. 92.] It is however admitted, that an information in equity in the name of the State, at the relation of the aggrieved party, may be maintained. [4 Hawks' Rep. 384; 5 Porter's Rep. 313; 12 Pet. Rep. 91; 3 Atk. Rep. 751.]

The grant of the legislature to McDougald and others, was the creation of a trust for the public convenience, and could not be assigned—the assignment was a breach of the trust and operated a forfeiture. [2 Bac. Ab. Tit. Execution, C.; 1 Cow. & H.'s Dig. 374; 19 Johns. Rep. 456.] But if the franchise has been invaded by the defendants, the statute prescribes the penalty, and for this the party injured should proceed.

The streets of the town of Girard are public highways, and the commissioners' court of Russell might erect a toll gate across them. [5 Porter's Rep. 311; Clay's Dig. 513, §§ 25, 26.]

If the gate erected under the authority of the commissioners' court is not placed upon the complainant's land, then they have no right to enjoin the collection of tolls—nor is the allegation sufficient that complainant's profits are likely to be diminished. [11 Pet. Rep. 420.] If the tolls have been improperly collected in Alabama, they may be recovered back, (Clay's Dig. 513, § 27; 2 Porter's Rep. 307,) but this furnishes no ground for an injunction. The doctrine that a franchise can't be impaired, and that all competition may be excluded, can't be maintained—monopolies are against the policy of the State. [19 Ves. Rep. 616; 4 T. Rep. 666; 2 B. & Adol. Rep. 792; 2 Paige's Rep. 116; 1 Wheat. Rep. 115.]

Chancery will not exercise a primary jurisdiction in cases of nuisance, unless the necessity be pressing—there must first be a trial at law. [18 Ves. Rep. 245; 2 Dana's Rep. 158; 12 Pet. Rep. 91; 7 Porter's Rep. 238; 3 Ired. Eq. Rep. 301; 10 Wend. Rep. 324; 3 Atk. Rep. 750; 5 Porter's R. 313; 4 Hawk. Rep. 384.]

The court of revenue and roads may license the erection of a toll gate, or a bridge, or the establishment of a ferry at

" a city or town," though within two miles of another previously licensed. [Clay's Dig. 508, § 7 ; 514, § 29 ; 2 Porter's Rep. 296.] One prejudiced by a private ferry illegally used, may restrain its use by an injunction, and in principle the cases cited for the plaintiff in error do not go beyond this. [See 2 Saund. Rep. 172 ; Willes' Rep. 508 ; 1 N. & McC. Rep. 387 ; 5 Johns. Ch. Rep. 101 ; 2 Stewart's Rep. 211.]

COLLIER, C. J.—The act 1834, referred to in the bill, recites that the commissioners of the town of Columbus " have erected a bridge across the Chattahoochie river, opposite that city, and that the western abutment of said bridge rests upon the lands of Daniel McDougald, Robert Collins, James C. Watson and Burton Hepburn, within the chartered limits and jurisdiction of this State." And thereupon enacts that the parties whose lands are thus encroached upon, and their assigns, are " authorized to make and erect all things necessary to the permanent erection of the western abutment of said bridge, on their own lands." The bridge as then located, was declared permanent, and it was enacted that no person shall be authorized to erect a bridge, or attach an abutment to the western bank of the Chatahoochie river, nor establish any ferry within two miles of the bridge, either above or below. If any bridge or ferry is established within two miles of that then erected, the owner of such bridge or ferry, shall forfeit and pay for every day he shall keep the same in operation, or it shall "remain attached and affixed to the western bank of the Chattahoochie," the sum of twenty dollars. *Further*, upon the payment by McDougald, Collins " and their associates, or assigns," of " one half the value of the bridge erected as aforesaid," then they were authorized to demand and receive, at the western abutment, toll, the rates of which are prescribed by the act. Under the authority of this enactment, McDougald and his associates conveyed to the complainant, not only the land on which the western abutment of the bridge rested, but also the privileges and immunities conferred by the act. The questions now to be considered are—1. Was the conveyance effectual to invest the complainant with a title to the land, or the right

to "demand and receive tolls" from persons passing over the bridge? 2. Does the bill disclose a case which authorizes a court of chancery to grant an injunction?

1. We need not inquire whether it is competent for a corporation created in one State, to purchase and hold lands in another State, but we think it well worthy of consideration, whether such a sale, consummated by deed, would not estop the vendor, or whether a wrongdoer would be permitted to insist on its invalidity? There can be no question but the conveyance by McDougald and others, conferred upon complainant the right to enter and occupy the land, through its agents. But whatever may be the law in respect to the land, we think there can be no doubt of the complainant's capacity to purchase the franchise granted by the act. Such a right intimately concerned its interests, was necessary to the consummation of its title to the entire bridge, and to an investiture of the privileges and profits which its construction contemplated.

The right of a corporation to make contracts, in a State other than that of its creation, has been considered with great ability and clearness in several cases, by the Supreme Court of the United States. [13 Peters' Rep. 521; see also, 14 Pet. Rep. 60, 122, 393.] In the case first cited, it was conceded that a corporation could have no legal existence out of the limits of the sovereignty by which it is created; it exists in contemplation of, and by force of the law, and where that law ceases to operate, it can have no legal existence. "It must dwell in the place of its creation, and cannot migrate to another sovereignty." But while its habitation and existence in the land of its birth, is thus forcibly stated, it is said that its locality creates no insuperable objection to its contracting in another jurisdiction; that although it is an "artificial being, invisible and intangible, yet it is a person for certain purposes, in contemplation of law," and has been recognized as such, not only by the decisions of the Supreme Court of the United States, but by other tribunals. [See 11 Wheat. R. 412; 12 Pet. Rep. 135; 8 Porter's Rep. 404.] It is then said, that as natural persons, through the intervention of agents, make contracts in countries in which they do not reside, no objection is perceived to the capacity of an artificial

person, to contract in the same manner within the scope of its powers, in a sovereignty within which it does not reside ; *provided* the *lex loci contractus* permit such a contract to be made by it. It is admitted that the corporation must show that the law of its creation gave it authority to make such contracts through such agents. But "it is sufficient that its existence as an artificial person in the State of its creation, is acknowledged and recognized by the law of the nation where the dealing takes place, and that it is permitted by the laws of that place, to exercise there the powers with which it is endowed." *Again:* " The cases of contracts made in a foreign country, are familiar examples ; and Courts of justice have always expounded and executed them, according to the laws of the place in which they were made ; provided, that law was not repugnant to the laws or policy of their own country. The comity thus extended to other nations, is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered, and may be refused by it at pleasure." *Further*, "It is nothing more than the existence of an artificial person created by the law of another State, and clothed with the power of making certain contracts. It is but the usual comity of recognizing the law of another State." These propositions are amplified and illustrated in the cases referred to, by argument and authority so satisfactory, as to have received the approbation of the profession generally. [See 2 Lord Raym. 1532 ; S. C. 1 Stra. Rep. 612 ; 2 Id. 807 ; 1 C. & P. Rep. 569 ; 1 Dow's Rep. 169 ; S. C. 3 Sim. Rep. 338 ; 2 Rand. Rep. 465 ; 5 Id. 471 ; 10 Mass. Rep. 91 ; 5 Conn. Rep. 560 ; 1 Missouri Rep. 184; 8 Dana's Rep. 114 ; 4 Blackf. Rep. 202 ; 7 Mart. Rep. 31 ; 2 Stew. Rep. 147.]

The statute in question *in totidem verbis* confers the franchise upon the individuals designated, or their assigns ; thus giving in advance the legislative sanction to an assignment of the immunities and benefits it granted. This proposition is so obvious from the terms employed, as well as from the motives which must have induced the passage of the act, and its subject matter, that it requires no illustration. Where franchises are conferred in consideration of the personal confidence reposed in the grantee, perhaps it would not be per-

missible to assign them; especially if they involve a trust for the public. But where they are obtained merely with a view to individual advantage, we cannot very well conceive of any objection to their transfer, though the act creating them does not expressly provide for their assignment. It results then, that the complainant was competent to purchase the interest of *McDougald and his associates*, in the franchise which the legislature granted them; and that the latter were authorized to sell the same. This brings us to the consideration of the second question.

2. True, the case stated in the bill does not show that the bridge itself, or its appurtenances, have been injured by the defendants, or that they have interfered with its possession, or in any manner prevented the complainant from receiving toll from persons passing over it. But it is alledged, that under the authority of the commissioners court, a gate has been erected, immediately west of the bridge, through which no one is permitted to pass, either from or towards it, but upon the payment of toll—thus prejudicing the complainant's rights, &c. The consequence of the act complained of might have been stated with more particularity, yet we think it is substantially alledged, that the lessee under the order of the court, is participating, or attempting to participate, in the complainant's franchise, and will diminish their profits, by adding to the price of passing the bridge. Upon this hypothesis, we will consider the cause. In Osborn v. U. S. Bank, 9 Wheat. Rep. 738, 841; which was a bill for an injunction, at the suit of the defendants in error, to restrain the seizure of the money and property of the bank, in payment of a tax imposed by the legislature of Ohio, the court said, the interference of chancery for the protection of parties in the enjoyment of a franchise, "has most frequently been to restrain a person from violating an exclusive privilege by participating in it. But if, instead of a continued participation in the privilege, the attempt be to disable the party from using it, is not the reason for the interference of the court rather strengthened than weakened." The grounds upon which an injunction is granted is, to prevent a permanent injury from being done to the party entitled to the franchise or privilege, which injury cannot be estimated in damages, and

The Mayor, &c. of Columbus v. Rodgers, et al.

there are many cases of continuing injuries against which a court of equity will interpose. In the case cited, it was added, " The single act of levying the tax in the first instance, is the cause of an action at law; but that affords a remedy only for the single act, and is not equal to the remedy in Chancery, which prevents its repetition, and protects the privilege." So it has been held that a court of equity, pursuing the analogy of the law, that a party may maintain a private action for *special damage*, even in case of a public nuisance, will now take jurisdiction of a public nuisance, at the instance of a private person, where he is in imminent danger of suffering a special injury, for which, under the circumstances of the case, the law would not afford an adequate remedy. [12 Pet. Rep. 91, 98; 19 Ves. Rep. 616; 6 Johns. Ch. Rep. 439.] And in the last case cited, an injunction was granted to restrain a party from obstructing a street by building a house thereon; it being considered not only a public nuisance, but productive of injury to the plaintiffs in particular, by affecting the enjoyment and value of their property in the vicinity. See 6 John. Ch. Rep. 46; 1 Nich. H. & C. Rep. 436; 5 Porter's Rep. 279.

In Bemis v. Upham, 13 Pick. Rep. 169, it was contended at the bar, that chancery would take jurisdiction of nuisances only in urgent cases, where the prompt interposition of the court is necessary, by immediate injunction, and where the proceedings at law would be too slow. But the court considered that the promptness of the remedy in equity, though certainly one of its advantages, was no test of superior efficacy and completeness; and added, " we think it sufficient that the remedy in equity is more adequate and better adapted to reach the justice of the case, and more complete by being at once more comprehensive and effectual." [See 1 Gill & J. Rep. 1; 4 Hawks. Rep. 384.] It is a necessary sequence from these citations, that the party aggrieved is not obliged to establish his right at law, before he invokes the aid of equity to protect him in its enjoyment, unless it be doubtful. In the Croton Turnpike Co. v. Ryder, et al. 1 Johns. Ch. R. 611, it was held that an injunction will be granted to secure to a party the enjoyment of a privilege conferred by statute, of which he is in the actual possession, and when his title is

not put in doubt.    There, a turnpike company, incorporated with the exclusive privilege of erecting toll gates and receiving toll, had duly opened and established the road, with gates, &c.; and certain persons, with a view to avoid the payment of toll, opened a by-road. near the turnpike, and kept it open at their own expense, by which persons were enabled to avoid travelling through the gate and paying the toll to the plaintiff's; a perpetual injunction was granted to prevent the defendants from using, or allowing others to use such road; and the same was ordered to be closed.    The court said, "The jurisdiction in such a case is extremely benign and salutary.    Without it, the party would be exposed to constant and ruinous litigation, as well as to have his right excessively impaired by frauds and evasion.    If such a contrivance as this case presents is to be tolerated, all our statute privileges of the like kind, on which millions have been expended, would be rendered of little value, and the moneys have been laid out in vain."    See 2 Stew. Rep. 211; 5 Johns. Ch. Rep. 111.

The principles we have stated as sustained by adjudged cases, are all noticed by the learned author of the commentaries on equity jurisprudence, as furnishing grounds for the preventive and protective interference of equity, by injunction; and he cites many decisions which not only show that he is well supported, but an increased disposition of courts of chancery, in modern times, so to mould its jurisdiction in this respect, as to afford an adequate remedy to parties and to subserve the purposes of justice.    [2 Story's Eq. §§ 625 to 629.]

There can be no question but in cases of public nuisances properly so called, that an information lies at the suit of the Attorney General in equity to prevent the grievance, and in some cases of pressing necessity to abate it.    [See 5 Porter's Rep. 279; 2 Story's Eq. §§ 922 to 924.]    Yet in the case of a public nuisance, which specially affects an individual, it is competent for him to become an actor in his own name, and this whether he seeks redress in equity or at law; and neither reason or authority require a party to sue in the name of the State, in order to protect him in the enjoyment of a franchise duly created.    The citations we have made show this,

not only by express adjudication, but by the form in which the suits were brought. [See also 9 Johns. Ch. Rep. 439; 1 Green's Ch. Rep. 57; 21 Pick. Rep. 344; 1 Baldw. Rep. 231.]

We need not inquire whether the act of 1834, operated as a contract, or was a mere gratuity on the part of the State, which did not to any extent restrict the future action of the Legislature. Whether it be considered the one or the other, it certainly conferred a franchise, which the court of revenue and roads could not divest or infringe. [2 Porter's Rep. 296; 11 Peters' Rep. 420.]

The penalty which the act prescribes is not for the grievance for which the complainant seeks redress; but it is the erection of a bridge, or the establishment of a ferry within two miles of the complainant's bridge which is thus punishable. There is then no foundation for the objection that the statute prescribes a remedy, and that no other can be pursued. If, however, the objection was well founded in point of fact, it might well be questioned whether the legal inference deduced in argument could be supported. If the penalty was inadequate to protect the complainant's enjoyment of the franchise, or compensate for its disturbance, would it not be competent to maintain an action for damages, or in a proper case to invoke the preventive power of a court of Chancery.

In the case at bar, we think the emergency was such as to warrant the interposition of the transcendent power of equity by process of injunction. The obstruction which was made, as we have seen, under an authority merely colorable, was calculated to diminish the receipts of the complainant's tolls, by preventing many persons from passing the bridge in consequence of the increased charges; or to avoid the latter result, compelling the complainants to reduce the toll below the rates they were authorized to demand by law. Again: conceding that the parties liable for an infringement of the franchise were able to respond in damages, it would require actions incalculable in number, to be renewed as long as the obstruction continues. To quiet litigation and to administer speedy and effectual redress, it is altogether proper that chan-

7

cery should lend its aid, and the cases cited fully sanction its interference.

It is barely necessary to add that upon a motion to dismiss for want of equity, it is not allowable to look to any matter extrinsic of the bill. The bill must be taken as true. This view is decisive of the case, in the aspect in which it comes before us; the consequence is, that the decree of the court of chancery is reversed; and the cause remanded.