THE PENNSYLVANIA RAILROAD COMPANY AND THE UNITED NEW JERSEY RAILROAD AND CANAL COMPANY *vs.* THE NATIONAL RAILWAY COMPANY and others.

1. The franchise of the Camden and Amboy Railroad and Transportation Company, to perfect an expeditious and complete line of communication between the cities of Philadelphia and New York, and to build across the state a railroad, to be part of that line, is exclusive against all but the state and those upon whom the state has conferred it.

2. Any railroad over the state, wherever built, if built for and adapted to be part of a through competing line between said cities, is unlawful and liable to be enjoined, unless authorized by legislative enactment.

3. No authority is conferred by any or all of the charters together, of the several New Jersey corporations co-defendant with the National Railway Company, to build a road across the state, to be used for part of a competing line between the cities of Philadelphia and New York, and the attempt by the defendants to build such road is in fraud of the rights of the complainants, and will be enjoined.

4. The Pennsylvania Railroad Company, lessees of the works and franchises of the United Companies of New Jersey, by their failure to have their lease acknowledged or proved, and lodged for record with the secretary of state within thirty days after its execution, as required by law, are not thereby disentitled to an injunction to stay the threatened acts of the defendants. The lessors and lessees having together the whole legal ownership of the rights to be protected, are properly joined as complainants. The property to be protected belongs to the stockholders whom the complainants represent; and the defendants being wrong doers, cannot set up the alleged uncertainty of legal relations between the complainants, to justify their own wrongful acts, or to prevent the appropriate relief.

5. The rule is well settled and of the highest importance, that legislative grants to private corporations are to be strictly construed.

6. The franchise of taking tolls upon public ferries, bridges, or highways, is a part of the sovereign prerogative, to be obtained only by grant. Railroads for popular use and for tolls are *publici juris*.

This was an application for an injunction to enjoin the National Railway Company from proceeding further in the construction of their railroad across the state of New Jersey, intended to be used and operated as part of a through line between the cities of New York and Philadelphia. The argument was had upon a rule to show cause why an injunction should not issue pursuant to the prayer of the bill.

*Mr. Williamson, Mr. Stockton,* and *Mr. Cuyler,* for complainants.

*Attorney-General Gilchrist, Mr. Shipman,* and *Mr. C. Parker,* for defendants.

THE VICE-CHANCELLOR.

This suit is against nineteen defendants. Seven of them are incorporated companies, and twelve of them are some of the directors or stockholders. One of the corporate defendants, the National Railway Company, is a corporation of the state of Pennsylvania, and the other six are corporations of New Jersey. They are: The Peapack and Plainfield Railroad Company, the Elizabeth and New Providence Railroad Company, the Millstone and Trenton Railroad Company, the New Jersey Trust Company, the Narrow Gauge Railway Company, and the Stanhope Railroad Company. Under their respective charters, and under contracts of consolidation and lease, the defendants are co-operating in, and have begun the construction of a series of railroads in this state, to form across it a continuous road, to be part of a through line of communication between the cities of New York and Philadelphia.

The complainants are the United New Jersey Railroad and Canal Company, a corporation of New Jersey, and the Pennsylvania Railroad Company, a corporation of Pennsylvania. In the first of the corporate complainants are included and consolidated the companies formerly known as the Delaware and Raritan Canal Company, the Camden and

Amboy Railroad and Transportation Company, and the New Jersey Railroad and Transportation Company. The roads, canals, property, and franchises possessed, operated or held by these three corporations, were, before their consolidation into the above named United Company, leased and transferred by them to the Pennsylvania Railroad Company, for the term of nine hundred and ninety-nine years. By virtue of the possession and leasehold interest held or claimed to be held by the latter corporation in the demised property, and of the reversionary interest therein of the former, both are made complainants in the suit. As such they have three lines of communication between Philadelphia and New York. The first by ferry from New York to Jersey City; thence by railroad through Newark and New Brunswick to Trenton; thence by bridge across the Delaware river; thence by railroad to Philadelphia. The second by boats from New York to South Amboy; thence by railroad to Camden, and thence by ferry to Philadelphia. The third by canal from Bordentown to New Brunswick, and effecting a complete route from Philadelphia to New York by means of the Delaware river on the one side, and the Raritan river, Staten Island Sound, the Kill Von Kull and Newark Bay on the other. A branch or connecting road from Trenton to Bordentown is also to be included.

The through route projected by the defendants begins at Philadelphia; from thence in Pennsylvania to Yardleyville on the Delaware, about five miles above Trenton; thence over the Delaware and in a northeasterly direction near to Millstone, Plainfield, and Elizabeth, to some point on the waters adjacent to or in the vicinity of New York; and thence to that city by ferry. Considerable portions of this route are yet undetermined or unlocated, but its proposed course is in general as above. It is intended to be constructed and used for the transportation of passengers and freight between New York and Philadelphia, and to compete in business with the through business of the complainants between those cities. The right of the defendants to

build and operate this competing road is the substantial issue involved in this suit. This right is denied·by the complainants, who have exhibited their bill to restrain the defendants from proceeding to execute their purpose. At the filing of the bill, a rule to show cause was obtained, why a preliminary injunction should not issue, and the rule has been argued on the bill, answers, and depositions. The argument, which occupied, with the reading of the papers, the most of two weeks, was conducted on both sides with great thoroughness, ability, and learning.

The gravamen or gist of the case on the part of the complainants, is the injury to result to their through business by the diminution of their profits from the defendants' competition. The bill asserts, in brief, that, by the law of New Jersey, the state has exclusive control over the construction and maintenance of railroads and other internal improvements within her domain. That the right to build and operate a railroad for public use, and for tolls, is a right, privilege, or franchise which the state, through the legislature, is alone able to confer. That such right, unless so conferred, cannot exist. That when conferred it is property, and, like other property, entitled to the protection of the laws. That the franchise to build and use a railroad across the state, intended to be part of a through line of communication between the above mentioned cities, has been granted to the complainants, and that none has been granted to the defendants. That the defendants, in proceeding to build their road across the state, to be used for part of a competing line, are acting without authority or right, and that their threatened invasion of the complainants' franchise, is an injury which a court of equity will restrain. Out of these allegations, and their denial by the defendants, arise the substantial and decisive questions in the cause. They are:

1. Have the complainants such a franchise, exclusive against all but the state and those upon whom the state has conferred it?

The through lines of the complainants, as heretofore

stated, are three. One is by canal, and another by a connection of *local* roads, not originally and separately authorized for purposes of a through route. However much these two lines may have been heretofore used for such purposes, and whatever advantages they may so afford to the companies or the public, they have been little, if at all, referred to as entitled to be protected against the defendants' competition. The argument has turned upon the nature and extent of the franchise given to the Camden and Amboy Railroad and Transportation Company by its charter and supplements. The exclusive right to have one line, however, until the state shall have authorized another, will not be affected by the nature of the franchise by which the two other lines were constructed or are used.

The incorporating act of the last mentioned company was passed February 4th, 1830. The words descriptive of or defining its franchise now in question, are contained in the second and eleventh sections of the act. By the second section, the company was authorized to have, enjoy, and exercise all the rights, powers, and privileges pertaining to corporate bodies, and necessary to perfect an expeditious and complete line of communication from Philadelphia to New York, and to carry the objects of the act into effect. By the eleventh section was defined the location across the state, of the railroad to form part of the through line. It was to run from the Delaware river, at some point or points between Cooper's creek and Newton creek, in the county of Gloucester, to a suitable point or points, to be by them determined on, upon the Raritan bay. It is from this original act that the complainants derive their franchise now relied on, and termed pure and simple in distinction from special and larger ones subsequently acquired. These larger ones were expressed in later enactments, and in consideration of certain payments and agreements by the company, it was agreed by the state that it should not be lawful at any time during the company's charter, to construct without the company's consent any other railroad in this state, which should be intended

or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business with the company's road. Under this contract the company's franchise was exclusive against the state itself. The state had no right to authorize a competing road. These special privileges were afterwards modified by consent of the company, and by an act of 1854 were limited in duration to January 1st, 1869, at which date they expired, so that the exclusive privileges long held by the company and known as their monopoly rights, are not now in question, and have no important bearing on this cause. The privileges now relied on are those which it is said belong to every corporate body empowered by the state to operate a railroad for public use between certain specific points, and for certain specified purposes, and it is alleged as a principle of law that any competing road between the same terminal points, if not similarly authorized, is an injury to the property of the former, for which an injunction is the appropriate and rightful relief.

The authorities, relied on by the complainants to establish this legal proposition, and its applicability to their case, are the decisions of the courts of this state, and particularly that of the Court of Errors and Appeals in the case of *The Camden and Amboy Railroad Company* v. *The Raritan and Delaware Bay Railroad Company and others*, reported in 3 *C. E. Green* 546. That suit was brought to protect one of the through routes in this case, namely, that by the way of Camden and Amboy, from the injurious competition attempted to be made by a junction of two roads, one running from Camden to Atlantic City, and the other from the Raritan bay to Cape May. By means of the intersection of the lawful routes of these two roads a continuous railroad line was necessarily effected between Camden and the Raritan bay, which line by means of boats at each end, could be made a complete, although circuitous, route between Philadelphia and New York. The unavailable character of this circuitous route for purposes of competition was attempted to be relieved in two ways; first, by laying the road from

Raritan bay to Cape May, as it passed through the county of Burlington, some ten miles to the west of its proper location, and then second, by constructing a diagonal road between Atsion, a station on its line, and Jackson, a station on the road from Camden to Atlantic City. This diagonal road shortened the distance of the circuitous route, and made the shorter route so effected an efficient one for competition. The Camden and Amboy Company filed their bill to restrain the building of this cross branch and the use of the competing route, and after a protracted litigation a final decree was obtained in 1863, by which it was adjudged that the use of the connected roads for purposes of through travel and transportation, was an unlawful invasion of the complainants' rights, and such use was accordingly prohibited. In the opinion of Chancellor Green it was said, "The fact is clearly established that the railroads of the defendants are used for the transportation of passengers and merchandise between the cities of New York and Philadelphia, and are competing in business with the roads of the complainants, in direct violation of the engagements of the state, and of the rights and privileges of the complainants." The opinion and decree of the Chancellor were based upon the special or monopoly privileges mentioned above, and which were then in full force. In pursuance of his decree, the defendants were enjoined from such use of their road till January 1st, 1869, when those monopoly privileges were to end. From this decree both parties dissented, and the cause being carried by both to the Court of Appeals, was there determined in 1867. The grounds of the opinion of the Chancellor, and also the decree, so far as they went, were affirmed, but for failing to go further, and to extend the injunction beyond January 1st, 1869, and thereafter until the defendant corporations should obtain legislative permission for the use of a through route, the decree was deemed too restricted, and was consequently modified and enlarged.

"When, therefore," said the Chief Justice, in delivering the opinion of the court, "the complainants obtained from

the state the right to establish their road, I think that by the intrinsic force of such grant, such franchise was exclusive against all persons but the state. · A competing road, set up without a legislative sanction, is a fraud upon such grant, and is a plain public nuisance. The consequence is, that the case of the complainants, in my opinion, does not necessarily rest upon the express clause in their charter guaranteeing an exclusive privilege. After the 1st of January, 1869, when the effect of that clause shall be spent, the defendants, as at present constituted, will have no greater right than they now have to establish a line of railroad to compete in business with the complainants, between the cities of New York and Philadelphia."

The positions thus defined by the Chief Justice were the basis of a decree that the defendants be perpetually enjoined from ever using thereafter, under their charters then existing, the diagonal road from Atsion to Jackson, or any part of it, as a link in the line of communication between the above cities. And to provide against possible injury from the existence of the road as a de facto highway, a privilege was reserved to the complainants, if any adverse claim should be thereafter set up·by reason of the existence of that road, to have the same immediately abated, or so much of it as would sever the connection it formed between the other two roads. It thus distinctly appears that the ground of exclusive right against all but the state, by virtue of the original grant, was the express ground on which the action of the appellate tribunal proceeded. It was argued in the opinion and enforced in the decision. The same doctrine was re-asserted by the Chief Justice in 1871, sitting for the Chancellor, in the case of *The Erie Railroad Company* v. *The Delaware and Lackawanna Railroad Company and others,* 6 *C. E. Green* 286. "The first wrong," he says, "of which complaint is made, is that the exclusive franchise of the complainants of possessing a railroad, and carrying goods and passengers thereon from Paterson to Hoboken, has been infringed by the defendants. The claim is that the complainants have a grant from the

legislature to construct and run a railroad between these ter-mini, and that the defendants have no such authority, but have established a road between these cities by a perversion and in fraud of the statutable powers conferred on them. If affairs were purely in this condition, the position would be well taken."

The case of the Raritan and Delaware Bay road is then referred to by him and approved.

In view of these opinions and this decision, my impression was strong at the close of the argument, that the questions of the existence of the complainants' franchise, and its exclusive nature against all persons without a grant, could not be regarded as open ones, and that this court was necessarily bound so to declare. By an understanding with counsel on both sides, historical and other documents referred to in the course of the argument, and relating to the companies' charters and their contemporaneous exposition, together with the printed arguments themselves, were to be furnished me for more deliberate inspection. They were not furnished until several weeks later. I have since examined them with care, and am satisfied that my original impression was right, and that, sitting in a subordinate tribunal, I must hold the decision of the appellate one to be, in this case, authoritative and conclusive.

Several points have been strenuously urged against giving it this effect. One is, that the decision, so far as it exceeded the decree of the Chancellor, was not warranted by the plead-ings; was extra judicial, and therefore not decisive of the question now presented to this court. It is true that the original bill in the suit set up particularly the *monopoly* rights, and made them the grounds and the measure of the injunction that is asked for. But the answer of the Delaware and Raritan Company set up, among its matters of defence, that when those rights should expire, its through route could be legitimately used. This allegation of the answer was referred to in a supplemental bill of complaint that was after-wards filed, and in the latter bill the injunction prayed for

was without limitation of time. In both bills, also, there was a general prayer for relief. I am of opinion that so far as the pleadings are concerned, the Chancellor would have been justified in making, in the first instance, the decree that was afterwards directed. But if my opinion on this point of pleading were different, it is a point that was adjudged by the higher tribunal. It was there settled that the precise question decided was properly presented. The decree of the Chancellor was in 1863. In 1867, when decided on appeal, there remained but two years before the monopoly rights would expire. By the disposition then made of the broader question involved, and the settlement of the true nature and extent of the original franchise, the whole controversy was concluded and further litigation avoided.

But while this difference existed in the measure of relief as originally limited, and as afterwards enlarged, there was nothing in the reasonings of the Chancellor or the legal principles he laid down, at all at variance with those of the Court of Appeals. The same fundamental principles will be found in the opinions of both. In both is asserted the doctrine that the building and maintenance of highways involve the exercise of powers that are sovereign. That the franchise of taking tolls upon public ferries, bridges, or highways, is a part of the sovereign prerogative, to be had only by grant. In both, the common law doctrine is relied on, that if one had a ferry by prescription, another ferry, erected so near it as to draw away its custom, was a nuisance. And in both, the doctrine that a railroad for popular use and for tolls is *publici juris*, is assumed as indisputable law. Reference is also made in both to the opinion of Chancellor Kent, in *Newburgh Turnpike Co.* v. *Miller*, 5 *Johns. Ch.* 112, where a free bridge had been erected, without authority of law, in the vicinity of a turnpike bridge, and the defendant was enjoined from the continuance of the interference, the learned Chancellor declaring that the rules of the common law relating to ferries, fairs, markets, and toll bridges, were applicable to any of these similar privileges created by statute. The reference to this case of the bridge

was not made by the Chancellor or the Chief Justice, as I understand their opinions, in approval of the full extent of the application there made of the law. The bridge was there built over a private, and not a navigable stream. The toll-gate was put upon the bridge, and a free bridge was afterwards erected for the purposes of a local road a short distance below, and intended to open and develop the adjacent lands. Chancellor Kent held the free bridge an unlawful infringement of the franchise of the company, and in so holding, gave an extent to the turnpike company's rights by implication from their charter, which has since been denied and disapproved as incompatible with the just and rigorous rules by which implications from charters are now limited and restrained. The free bridge was held to be unlawful, not because there was no grant to authorize its erection, but because it interfered with the company's road. Had the grant been essential to its legality, the opinion of the learned Chancellor in that case would not now be open to question. The common law doctrine of the ferry, which he cited and relied on, *did* depend on the principle that a public ferry is a franchise requiring a grant from the crown. The Newburgh case was decided by Chancellor Kent in 1821. Since then, the views it contains as to implications from charters have been materially changed; but nothing in the sounder and better views since adopted, in anywise impairs the authority of his judgment in its bearing on the case now in hand. This is shown in the opinion of the Court of Appeals of New York, in *Auburn and Cato Plank Road Company* v. *Douglass,* 5 *Selden* 454. The company's road there was interfered with by a road which an adjacent land owner had made on his land. The company's suit was to restrain the defendant from permitting his road to be kept open, so that it might be used by the public for travel. The Court of Appeals denied the injunction, on the ground that the company's charter could not by implication restrict the defendant's rights in the use of his lands. But it was said by the court, that if an individual or company, without authority from the legisla-

ture, build another plank road so near as to interfere with the plaintiffs' road, and should set up a gate, and levy tolls upon the traveling public, the plaintiff, as well as the people, would have a remedy by action. The principle that such a road is *publici juris* was recognized as elementary. This principle disposes of the objection of counsel so much urged at the argument, that the franchise relied on in this suit gives the complainants by implication an easement in other lands not taken for their road. No easement is created, because no previously existing right of the land owner in his land is impaired. He cannot lose what he never possessed. When the franchise to operate a public highway for tolls is conferred by the state, it is so far a delegation of powers confided to it in trust by the people. These powers may be delegated in such form, either special or general, and with such conditions and regulations as the legislative discretion may prescribe. But, whether delegated by special charter or under general laws, they are emanations from the people in their sovereign capacity. What is not conferred is withheld, and remains in the original source. The attempt to exercise them by individuals or companies, until so conferred, can be nothing but an unwarrantable usurpation of power. This doctrine is rooted and grounded in the common law we inherit, and equally so in public policy and public expedience. It contemplates the construction and operation of railroads by the agency of corporations with their aggregated individual capital, but the corporations themselves, their franchises and roads, it aims to retain in subjection to the state, and to exercise over them a governmental control. The reverse of this relation it would be inadmissible to suppose.

Another of the several points that were urged, why the decision of the Appellate Court should not govern this case, is the alleged surrender by the company of its franchise, in pursuance of the act of 1854. The monopoly rights which the act of 1832 gave the company were co-existent with the charter. The act of 1854 was designed to secure their

Pennsylvania Railroad Co. *v.* National Railway Co.

speedier extinction. It provided that after January, 1869, it should be lawful, without the company's consent, to construct any railroad or railroads across the state to compete with their business. A formal acceptance of this act was filed by the company, and is the surrender referred to. This surrender, it is said, did not appear as a fact in the Raritan and Delaware suit, and does appear in this. It is claimed that the acceptance related back to the original charter, and divested of its exclusiveness the franchise which that act created. But if it be true that the railroad is *publici juris*, it is obvious that the effect contended for would happen only by giving to the words of the act of 1854, the operation of a general enactment divesting the state to that extent of its own exclusive powers. This construction would make the act a surrender by the state, and not a surrender to it. It is clear that the only purpose and operation of the act, and its acceptance, were to release the state from its contract, and leave it free to charter competing roads at its pleasure.

As a further reason why the appellate decision should not govern this case, it was said that the franchise of complainants was exclusive only against a competing road within three miles of their own. This is based on the twenty-fourth section of the original charter. It enacts, that if the state shall authorize any other railroad across the state from New York to Philadelphia, which shall commence and terminate within three miles of the commencement and termination of the company's road, the company should be exonerated from paying to the state the duties which that act imposed. The competing road enjoined by the Court of Appeals began at Camden, within three miles of the other. This has been urged as a reason why the decree in that case furnished no rule of law applicable to this. Stress has been laid upon the use by the court of the words *such a road*, to support the idea that a road not commencing within three miles of the complainants' did not come within the scope of its decision. But the answer is, that the provision of that section relates only to a competing road ending as well as beginning within

three miles of the terminal points of the other ; and further, that the road so enjoined did not terminate within three miles of the other, the one ending at South Amboy, and the other at Port Monmouth. It is obvious that the words *such a road,* as used by the court, cannot operate, in connection with the words of the twenty-fourth section, to limit the scope of the decision, or to discriminate in any respect that case from this. It may also be noted that the words of that section are quite consistent with the doctrine that any road to be constructed, either within or beyond the three miles, must be authorized by the state.

I am unable to perceive any principle or fact in the present case that can avail to take it out of the operation of the law in New Jersey as thus judicially determined.

The law so determined is, that the express words of the charter of 1830, conferring the franchise necessary to perfect an expeditious and complete line of communication from Philadelphia to New York, and to build across the state a railroad to be part of that line, gave to the grantees an exclusive right until the state should otherwise provide. That any road over the state, wherever built, if built for and adapted to be part of a through competing line from city to city, is unlawful, and liable to be enjoined. The defendants' road is to be built for this purpose. Its proposed route is adapted to accomplish it, and unless authorized by the legislature, is, in contemplation of law, in fraud of the rights of complainants.

This brings me to inquire :

2. Have the defendants the necessary grant?

It is to be found, if at all, in one or more of the following incorporating acts :

1. The Peapack and Plainfield Railroad Company, approved March 30th, 1855, with its several supplements of February 29th, 1856, March 13th, 1861, and March 11th, 1864.

2. The Millstone and Trenton Railroad Company, approved April 3d, 1867.

3. The Elizabeth and New Providence Railroad Company, approved March 22d, 1867.

4. The New Jersey Trust Company, approved April 16th, 1868.

5. An act to authorize the construction of narrow gauge railways, approved March 22d, 1871.

6. The Stanhope Railroad Company, approved March 13th, 1872.

Do these acts, or any of them, authorize the proposed road?

No rules of law are better settled than those applicable to legislative grants to private corporations. In the Delaware Bay case, 1 *C. E. Green* 372, it was said by Chancellor Green, "It is a well settled rule that public grants are to be construed strictly; and in all cases of grants of franchises by the public to a private corporation, the established rule of construction is, that any ambiguity in the terms of the contract must operate against the corporation and in favor of the public. The corporation takes nothing that is not clearly given by the act."

The same rule has been repeatedly expressed and enforced by the courts of this state, by those of other states, and by the Supreme Court of the United States.

In *Perrine* v. *Chesapeake and Delaware Canal Company,* 9 *How.* 192, Chief Justice Taney, delivering the opinion of the Supreme Court, said, "But the rules of construction in cases of this description as recognized by this court in the case of *The Charles River Bridge* v. *The Warren Bridge,* 11 *Peters* 420, is this: That any ambiguity in the terms of the grant must operate against the corporation and in favor of the public, and the corporation can claim nothing that is not clearly given by the law. The charter must be fairly examined and considered, and reasonably and justly expounded. But if, upon such an examination, there is doubt or ambiguity in its terms, and the power claimed is not clearly given, it cannot be exercised. The rights of the public are

never presumed to be surrendered, unless the intention to surrender clearly appears in the law."

In *Commonwealth* v. *The Erie and Northeast Railroad Company*, 27 *Penn. State R.* 339, the Supreme Court of Pennsylvania, expressed the same doctrine as follows:

"An act of incorporation is and always must be interpreted by a rule so simple that no man, whether lawyer or layman, can misunderstand or misapply it. That which a company is authorized to do by its act of incorporation, it may do; beyond that all its acts are illegal, and the power must be given in plain words or by necessary implication. All powers not given in this direct and unmistakable manner are withheld. It is strange that the Attorney-General or any body else should complain against a company that keeps itself within bounds that are always thus clearly made, and equally strange that a company that has happened to transgress them, should come before us with the faintest hope of being sustained. In such cases ingenuity has nothing to work with, since nothing can be either proved or disproved by logic or inferential reasoning. If you assert that a corporation has certain privileges, show us the words of the legislature conferring them. Failing in this you must give up your claim, for nothing else can possibly avail you. A doubtful charter does not exist, because whatever is doubtful is decisively certain against the corporation. The doctrine is maintained by the Supreme Court of the United States, and in many states of the Union. Even in England, the justice and necessity of it are universally acknowledged and acted on. But we do not mean to discuss the subject over again. The lawyer who is not already familiar with the numerous authorities upon it, to be found in every book of reports, will probably never become so; and the citizen who does not believe it to be a most salutary feature in our jurisprudence would hardly be convinced, though one rose from the dead."

It would be easy to cite from opinions delivered in nu-

Pennsylvania Railroad Co. *v.* National Railway Co.

merous cases in our own state and others, where the same rule has been affirmed with equal explicitness and emphasis.

But it is needless to do so. The foregoing will suffice to show with what strictness the doctrine is uniformly maintained. Its object and aim are apparent, and of the very highest importance. They are to prevent men from obtaining from the legislature the passage of acts without disclosing their real meaning and purpose; to protect the legislature from being misled by doubtful or ambiguous language; to permit nothing to be acquired from the public by covert and cunningly devised phrases; to compel those who ask for special privileges to say frankly and unmistakably what they mean, so that plain men cannot fail to understand what it is they are asked to vote away. The same things are meant to be secured by that part of our state Constitution, which ordains: Article 4; section 7; clause 4: "To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title."

Now, applying these principles to the six acts enumerated above, and asking the question, do these acts authorize the defendants to build a road across the state to be part of a through line from Philadelphia to New York, I cannot hesitate to answer that question in the negative. The first five of them do not remotely suggest such a purpose. On the contrary they repel and exclude it. The Peapack and Plainfield, the Elizabeth and New Providence, and the Millstone and Trenton roads are limited by their charters to certain terminal points. These points are sufficiently indicated by the names of the places in their titles. Except between points in or near to these places they cannot lawfully be built. If built in accordance with their charters they could not connect to form a continuous line.

The Narrow Gauge Company is incorporated under a somewhat general act. The beginning and ending points of the road or roads authorized by this act are not definitely

fixed as in ordinary charters. But without adverting to the peculiar objects professedly aimed at in this act, it is sufficient to say that any road to be built under it is restricted in gauge. Its rails cannot be laid at a greater distance than three feet six inches apart. This restriction effectually prevents any road of this company from forming part of a through line. The act also provides that no road to be built under it shall be authorized to cross by bridge or otherwise the Raritan river.

Under no other act but this do the defendants claim authority for that part of their line from Millstone to and across that river, but allege that no legislative authority is needed. This allegation, we have already seen, cannot be sustained. A similar prohibition as to crossing the Delaware is contained in the Millstone and Trenton charter, and evinces the same absence of any legislative intent to grant a through route. The New Jersey Trust Company, being the fifth mentioned above, exists under a supplement of April 2d, 1869, to the original act of April 16th, 1868. The original act, as its title imports, had no relation to railroads. The supplement authorized the erection of warehouses and other buildings for the company's business in the county of Hudson, on the shore of Hudson river or New York bay, or of waters adjacent thereto, and to construct a tramway or railway from its warehouses to any railroad running through or having its terminus in the county of Hudson; from this supplement the franchise is sought to be derived for that part of the road between Elizabeth and the waters opposite or near to New York. It is plain how obnoxious this supplement is to the objection that its object is not expressed by its title. Bearing in mind the positive prohibitions as to crossing the Raritan and Delaware rivers, and the equally positive restriction as to gauge which some of these acts contain—looking also to the special and local purposes they were declared to be intended for, the proposition that they cannot be held to contemplate or authorize a continuous through road must be regarded as incapable of serious dispute.

That the Stanhope charter does not authorize such a road is hardly less clear. Its title is "An act to incorporate the Stanhope Railroad Company." It authorizes a railroad from some point on Walkill Mountain, within three miles of Lake Hopatcong, to the Morris and Essex Railroad at Stanhope, or to some point on Lake Hopatcong. All the provisions of this act with two exceptional passages, are exclusively applicable to the construction of this short and comparatively insignificant road, and refer to no other object. These two exceptional passages are in the sixth and eighth sections. *Without* these passages the act is complete in itself, is in the customary orderly form, and its provisions are easily understood; *with* them the arrangement of parts is interfered with, and the meaning obscured. They are interjected and unsuited to the context. The second and most important of these passages, namely, that in the eighth section, is charged to have been fraudulently inserted, and not to have been brought to the notice of or voted on by the legislature; and much of the argument turned upon the two questions relating to this passage, whether first, it was competent to go behind the authenticated copy of the act, and show by proofs that the act in its present form was obtained by imposition and fraud; and second, whether if competent to do so, the evidence produced for that purpose is sufficient to demonstrate the fraud. In the view I take of the case, it is unnecessary now to decide either one of these controverted questions. My opinion is, that assuming the whole act to have been regularly passed and approved, it manifestly fails to confer the franchise for which the defendants contend. They seek to derive it from the exceptional passages in the sixth and eighth sections. The first is inserted apart from the language describing the location of the road mentioned in the title, and is appended to the enumeration of powers given to lay out, construct, and repair that road, and that road alone. To this enumeration of powers to be exercised solely upon the designated route from the Walkill Mountains to Stanhope or Lake Hopatcong, are appended the

words : "and for the conveyance of passengers and freight to and from the terminus thereof, to and from the city of New York and elsewhere, subject to such compensation as is hereinafter provided."

It would be difficult to say, with precision and certainty, what effect, if any, can be given to these words, or what the mode of conveyance here alluded to is ; but whatever may be meant by the words, how can they be said to suggest, still less to express, a legislative intent to authorize a road from the Delaware river to the Hudson, whose nearest approach to the Stanhope road is more than twenty miles distant? I think they cannot.

The eighth section entire is as follows :

" 8. *And be it enacted,* That in case any owner or owners of such land or real estate shall be feme covert, under age, non compos, out of the state, or under any other legal disability which would prevent their agreement with the said company, then it shall be the duty of the said company to pay the amount of any award or report so made in behalf of any such person, into the Court of Chancery, to the clerk thereof, subject to the order of the said court, for the use of any such owner or owners, all of which said proceedings, as well under this as the preceding section of this act, shall be at the proper costs and charges of the said company, except in cases of appeal above provided for; and the said justice shall and may order and direct as to the amount of costs and charges of such valuation and appraisements, and witness fees, and as to the payment thereof in cases where an appeal is made ; and it shall be lawful for the said corporation, at any time during the continuance of its charter, from time to time to unite and consolidate, as well as merge its stock, property, franchises and road, with those of any other corporation or corporations heretofore or hereafter incorporated within or without this state, and such other corporation and corporations are hereby authorized to unite, consolidate, and merge their stock, property, franchises, road, and roads with this corporation ; and after such merger into this corporation, this

corporation may from time to time lease its roads, franchises, and property, or any part thereof, to any other corporation or corporations within or without this state, and such other corporation and corporations are hereby authorized to take such lease or leases, and this and the other corporation or corporations may use and operate this road, or their own roads, or all or any of them, according to the provisions and restrictions contained in the charter of this corporation, or in the charter of such other corporation or corporations, or both; and this and the other corporations may make contracts and engagements with any other corporation or corporations, or with individuals, for operating this road, or said other roads, or parts of either or both, as well as for transporting passengers, freight, and trains over this road, and said other roads, or any part thereof, or over any road, and demand and receive for the transportation of passengers, freight, and trains over their roads, and the roads of such other corporations as are above mentioned, and over any other roads, the same rates of fare, freight, and toll as are authorized to be charged by this corporation for like services over this road; and this corporation may be known by such new name as its directors shall, by certificate filed in the secretary of state's office, declare to be its name; and to build this road, and the road of any other corporation which may lease the same, it and its lessees may make the bonds and mortgages hereinafter authorized; and it and its lessees, successors, and assigns, may exercise and possess all the railroads, franchises, and property so as aforesaid merged into it, without restriction as to the gauge of tracks, in the same manner, and with like effect, as if it had been specially created by act of the legislature of this state to exercise the same; and the legislature shall have power to alter, revoke, or annul this charter whenever the courts shall have decided it to be injurious to the citizens of this state, by reason of a misuse of the powers herein granted, and not otherwise."

The alleged interpolated part of this section, and the part on which the defendants rely, is that which begins at the

close of the provisions for the assessment of damages for lands taken for the construction of the road from the Walkill to Stanhope. The powers involved in the general terms in which this part of the section is couched, are extraordinary and extensive. In alleged pursuance of them the six New Jersey corporation defendants in this suit entered into a contract of consolidation on the 10th of June, 1872, for the merging into the Stanhope company of all the stock, property, franchises, and roads of the five other corporations; and on the 1st of July, 1872, the Stanhope company, claiming to be vested, by virtue of such 'merger, with all the property and franchises vested in the said five corporations respectively, entered into a contract with the National Railway Company, whereby the consolidated Stanhope company leased to the National Railway Company all its property, franchises and appurtenances, for the purpose, as expressed in said contract of lease, of building and operating the said several railways to form a continuous line from a point on the Hudson river or New York bay, opposite the city of New York, to a point on or above the middle of the Delaware river, near Yardleyville, so as to connect with the railroad in Pennsylvania, of the party of the first part, whereby to form a continuous railroad from Jersey City, in the state of New Jersey, to the city of Philadelphia, in the state of Pennsylvania.

The legality of these contracts has been denied by the complainants, on the grounds that some of the contracting New Jersey corporations were not organized in pursuance of the terms of their charters; that the time limited in the Millstone and Trenton charter expired before the road had begun to be built, making the act consequently void. Much of the evidence, and not a little of the argument, was directed to one or both of these points. It is unnecessary on this motion to decide them; assuming them settled in accordance with the claim of the defendants, the insuperable difficulty remains that the section makes no adequate provision for a continuous road across the state, to be part of a through

line. It does not do so expressly or by necessary implication. Whether the merger and union it speaks of be only of roads connected with the Stanhope or not, are questions which the vagueness of the terms referring to such union and merger make it difficult, if not impossible, to answer. Logic and inferential reasoning would be at fault, if logic and inferential reasoning were admissible to deal with equivocal terms. But "what is doubtful is decisively certain against the corporation." The section does not repeal or affect the prohibitions of the charters of the associated companies as to crossing the Delaware and Raritan rivers, nor can it prevail to repeal the limitation of gauge contained in the narrow gauge charter; on the contrary, the limitation is recognized as existing, and the utmost authority afforded by any legitimate construction of the words is, that companies may consolidate whose roads are of different gauge. But here again, if the words could fairly be deemed of doubtful or ambiguous import, the construction must still for that reason be adverse to the grant. So that waiving the unprecedented character of the superadded part of the section, and its want of congruity with the title and scope of the act, it adds nothing by its terms as they stand for the purposes of a through route, to the powers conferred by the several charters with which it is merged. It is powerless to change the entire purposes and objects of five several acts, to repeal their prohibitions and supply their defects. It attempts, perhaps, to do so, but the oblique and disguised methods of the attempt are insufficient for success. It apparently aims at the acquisition of privileges of indefinite duration and extent, and to secure them when acquired, against the power of sovereignty itself to repeal. There is nothing whatever in the superadded part of this section, however it be viewed, to entitle it to any exemption from the strict and salutary rules by which charters are governed. Much indeed was said at the argument of the public wants and the public demands which the through road, proposed to be built under it, is intended to meet; and the present conditions of population

and commerce, as contrasted with the conditions existing in the state when the complainants' franchises were granted, were eloquently and forcibly presented. But it is surely needless to say that, however weighty these considerations may be, they are considerations for the legislature, and not for the courts. Courts can interpret grants, but cannot create them. If the legislative fidelity and discretion, on which their creation depends, could be supposed in any instance to be unequal to the wants and demands of the people, the remedy would not be in the judicial tribunals, but in the people themselves. The courts will not disregard or pervert or evade the just and well-settled rules of the law. Could they do so in one case, they could also in others, and, exposed to an arbitrary discretion, no property or rights would be safe.

The existence of the franchise in the complainants and the absence of it in the defendants being arrived at, the remaining points may be briefly disposed of. They are of a subordinate and technical nature.

The Pennsylvania Railroad Company is a party complainant, as before stated, by virtue of a lease for nine hundred and ninety-nine years. By an act of April 4th, 1871, all contracts for leasing, consolidating, merging, or in any manner disposing of the franchises, privileges, or any part thereof, of any corporation of this state, are required to be acknowledged or proved, and lodged for record with the secretary of state. Unless this be done within thirty days from the date of execution, it is enacted that the same shall become invalid and of no effect. The lease here was executed or delivered in September, 1871, and had not been recorded at the commencement of this suit. The defendants insist that the Pennsylvania Railroad Company, by reason of such default, are not entitled to prosecute the suit, and show no title to an injunction to stay the threatened acts complained of. There is a misjoinder, it is said, of complainants.

That a lease was actually made, that the latter company entered into possession and are operating the road, are facts

Pennsylvania Railroad Co. *v.* National Railway Co.

that sufficiently appear and are not denied.   The property to be protected is the property of the stockholders, for whom the complainants are trustees.   Each of the complainant corporations has an interest of some kind and to some extent in the property demised, and they have, together, the whole legal ownership of the rights to be protected.   The uncertainty of the legal relations between the complainants themselves, or of their respective interests in the subject matter of the suit, cannot justify the defendants in their action as wrong doers, or be taken advantage of to defeat the appropriate preventive relief.   Were the suit by the lessees against the lessors, and dependent on the validity of the lease, the case would be essentially different.   In that case, the doubtful title might be a ground why the intervention of the court should be refused.   The rule is elementary, that all persons interested in the object of the suit must be parties as complainants or defendants.   I am of opinion that the complainants are properly joined.

Nor can I find any force in the technical objections against the form and sufficiency of the allegations of the bill, nor in the suggestion that the complainants are chargeable with laches through any delay in bringing their suit.   There is nothing in the nature of the delay, if any appears, which could operate as an estoppel or have the effect of acquiescence.

The case, as I view it, is unembarrassed by any questions of form, and must be decided on its substance.   The complainants have a clear title and the defendants have none. The authority of the New Jersey companies to construct and operate their own local roads, as before said, is not now to be settled.   The injury to the complainants will result from the through road to be built under the contract between the defendant corporations of July 1st, 1872.   For this continuous through road from and across the Delaware river to or near the waters of the Hudson, there is no legislative permission, and its construction is an unlawful assumption of power.

My conclusion is, that the National Railway Company, its

associates, coadjutors, and agents, must be enjoined from further proceeding to construct this road as part of a through line between the cities of New York and Philadelphia.

I shall so advise his Honor the Chancellor.